UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| |
|---|
| HUTCH & ASSOCIATES, INC. d/b/a HUTCH'S RESTAURANT; and DELAWARE RESTAURANT HOLDINGS, LLC d/b/a REMINGTON TAVERN & SEAFOOD EXCHANGE, for themselves and on behalf of a class of similarly situated policyholders, |

HUTCH & ASSOCIATES, INC. d/b/a HUTCH'S
RESTAURANT; and
DELAWARE RESTAURANT HOLDINGS, LLC
d/b/a REMINGTON TAVERN & SEAFOOD
EXCHANGE,
for themselves and on behalf of a class of
similarly situated policyholders,

                                       Plaintiffs,

- v -

ERIE INSURANCE COMPANY OF NEW YORK;
ERIE INDEMNITY COMPANY d/b/a
ERIE INSURANCE GROUP;
ERIE INSURANCE COMPANY;
ERIE INSURANCE PROPERTY & CASUALTY
COMPANY;
ERIE INSURANCE EXCHANGE; and
FLAGSHIP CITY INSURANCE COMPANY,

                                  Defendants.

Civ. Action No.:
1:20-cv-00896-GWC

*Hon. Geoffrey Crawford, Presiding*

JURY TRIAL DEMANDED

---

MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS

---

Buffalo, New York
September 30, 2020

---

DUKE HOLZMAN PHOTIADIS & GRESENS LLP
Charles C. Ritter, Jr.
Steven W. Klutkowski
Christopher M. Berloth
*Attorneys for Plaintiffs*
701 Seneca Street, Suite 750
Buffalo, New York 14210
critter@dhpglaw.com
sklutkowski@dhpglaw.com
cberloth@dhpglaw.com

## TABLE OF CONTENTS

**TABLE OF CONTENTS**.................................................................................................i

**TABLE OF AUTHORITIES**.......................................................................................iii

**PRELIMINARY STATEMENT**....................................................................................1

**BACKGROUND**.........................................................................................................3

**ARGUMENT**............................................................................................................10

> **POINT I:**
> LEGAL STANDARDS ............................................................................................10
>
> > A. Motion to Dismiss Standard ......................................................................10
> >
> > B. Insurance Policy Interpretation Standard.................................................11
>
> **POINT II:**
> PLAINTIFFS STATE A VIABLE CLAIM FOR DIRECT PHYSICAL LOSS OF OR DAMAGE TO
> THE COVERED PROPERTY AS A RESULT OF THE PRESENCE OF COVID-19 ...........................13
>
> > A. Defendants' interpretation of the Physical Loss Language is inconsistent
> > with the terms of the Policy and renders numerous provisions meaningless ..................13
> >
> > > 1. Defendants knowingly failed to include a virus exclusion in the Policy ....................14
> > >
> > > 2. Defendants' interpretation of the Policy renders various exclusions and
> > > limitations in the Policy meaningless and superfluous .................................16
> > >
> > > 3. Defendants interpretation of the Policy impermissibly equates "direct
> > > physical loss" with "direct physical damage" ............................................17
> >
> > B. Governing case law supports that COVID-related losses are covered under
> > the Policy.....................................................................................................19
> >
> > > 1. The recent COVID-19 Cases support that the presence of COVID-19
> > > is a covered cause of loss .......................................................................20
> > >
> > > 2. Long-standing and well-established case law demonstrates that "physical
> > > alteration" is not required to establish "direct physical loss of or damage
> > > to" property ...........................................................................................22
> > >
> > > 3. The case law cited by Defendants is inapplicable, distinguishable, and does
> > > not support that physical alteration of property is required by the Physical Loss
> > > Language ..............................................................................................28
>
> **POINT III:**
> PLAINTIFFS STATE A VIABLE CLAIM FOR CIVIL AUTHORITY INSURANCE COVERAGE ........................32
>
> > A. Plaintiffs satisfactorily allege damage to property other than property on
> > the insured's premises ................................................................................33

B. The Policy does not require "all" access be restricted for civil authority losses to be covered ............................................................................................... 34

C. Defendants' contention that the CA Orders were not issued in response to property damage is conclusory and unsupported ............................................................... 38

**POINT IV:**
PLAINTIFFS STATE A VIABLE CLAIM UNDER NEW YORK GBL § 349 ................................. 39

A. Defendants' engaged in consumer-oriented activities in deciding to universally deny COVID-related claims regardless of the insureds' specific factual circumstances .................................................................... 39

  1. The instant case presents an insurance dispute involving consumer-oriented activities ..................................................................................... 40

  2. Defendants conduct was consumer-oriented due to the nature of the agreement, their use of uniform, standard forms, and Plaintiffs' lack of bargaining power .......... 43

  3. Defendants' improper claims handling practices resulted in Plaintiffs and class-member-insureds not being given the opportunity to submit their loss damages ........ 44

B. Defendants' engaged in materially false and deceptive activities resulting in actual injury to Plaintiffs ................................................................... 45

**CONCLUSION** ............................................................................................... 46

# TABLE OF AUTHORITIES

**STATUTES/RULES/REGULATIONS:**

FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) ..................................................... 1, 9, 20

N.Y. GEN. BUS. LAW § 349.......................................................................... 39, 40, 41

11 N.Y.C.R.R. 216.6(h) .................................................................................. 44


**CASES:**

10E, LLC v. Travelers Indem. Co. of Conn.,
    (C.D. Cal. Case No. 2:20-cv-04418) (Doc. 11-8)............................................. 29, 31

54th St. Ltd. Partners, L.P. v. Fid. and Guar. Ins. Co.,
    306 A.D.2d 67 (1st Dept. 2003)................................................................... 35, 36

Ball v. U.S. Fid. & Guar. Co.,
    1989 WL 135903 (S.D.N.Y. 1989)................................................................ 4, 5

Bartlett v. Nationwide Mut. Fire Ins. Co.,
    2013 U.S. Dist. LEXIS 22320 (W.D.N.Y. Feb. 19, 2013) ..................................... 40

Beardslee v. Inflection Energy, LLC,
    25 N.Y.3d 150 (N.Y. 2015) ......................................................................... 34

Bi-Economy Mkt., Inc. v. Harleysvill Ins. Co. of N.Y.,
    10 N.Y.3d 187 (N.Y. 2008) ........................................................................... 1

Blue Springs Dental Care, LLC, et al. v. Owners Insurance Co.,
    20-CV-00383-SRB, ---F. Supp. 3d.---, 2020 WL 5637963 (W.D. Mo. Sep. 21, 2020)..... 21, 22

Broome Cnty. v. The Travelers Indem. Co.,
    125 A.D.3d 1241 (3d Dept. 2015) ................................................................... 28

City of N.Y. v. Smokes-Spirits.Com, Inc.,
    12 N.Y.3d 616 (N.Y. 2009) ........................................................................... 39

Columbiaknit, Inc. v. Affiliated FM Ins. Co.,
    1999 WL 619100 (D. Or. 1999)...................................................................... 25

Cooper v. Travelers Indem. Co. of Illinois,
    2002 WL 32775680 (N.D. Cal. 2002), aff'd, 113 F. App'x 198 (9th Cir. 2004) ................... 25

Cortec Indus., Inc. v. Sum Holding L.P.,
    949 F.2d 42 (2d Cir. 1991)........................................................................... 10

(**CASES CONT.**):

County of Columbia v. Cont. Ins. Co.,
    83 N.Y.2d 618 (N.Y. 1994) ....................................................................... 12, 16, 17

Datatab, Inc. v. St. Paul Fire & Marine Ins. Co.,
    347 F. Supp. 36 (S.D.N.Y 1972) .............................................................. 36, 37, 38

Diesel Barbershop, LLC v. State Farm Lloyds,
    (W.D. Tex. Case No. 5:20-CV-461) (Doc. 11-5) ............................................ 29, 31

Duane Reade, Inc. v. St. Paul Fire and Mar. Ins. Co.,
    411 F.3d 384 (2d Cir. 2005)........................................................................ 11, 12

Employers' Liability Assurance Corp. v. Aresty,
    11 A.D.2d 331 (1st Dept. 1960)............................................................................ 11

Erie R.R. v. Thompkins,
    304 U.S. 64 (1938)............................................................................................... 11

Essex Ins. Co. v. BloomSouth Flooring Corp.,
    562 F.3d 399 (1st Cir. 2009)................................................................................ 24

Farmers Ins. Co. of Oregon v. Trutanich,
    123 Or. App. 6 (Or. 1993).............................................................................. 26, 27

Friends of Danny DeVito v. Wolf,
    227 A.3d 872 (Pa. 2020) ............................................................................. 7, 8, 34

Gavrilldes Mgmt. Co. v. Michigan Ins. Co.,
    (Mich. Cir. Ct. File No. 20-258-CB) (Doc. 11-6)........................................... 29, 31

Gen. Mills, Inc. v. Gold Medal Ins. Co.,
    622 N.W.2d 147 (Minn. Ct. App. 2001)............................................................... 26

Greaves v. Pub. Serv. Mut. Ins. Co.,
    5 N.Y.2d 120 (N.Y. 1959) ................................................................................... 16

Gregory Packaging, Inc. v. Travelers Property Cas. Co.,
    2014 WL 6675934 (D.N.J. 2014) ......................................................................... 25

GSI Commerce Sols., Inc. v. BabyCenter, L.L.C.,
    618 F.3d 204 (2d Cir. 2010)................................................................................. 12

H&H Envtl. Sys., Inc. v. Evanston Ins. Co.,
    No. 6:18-CV-06315 EAW, 2019 WL 1129434 (W.D.N.Y. Mar. 12, 2019) ........... 40

In re September 11 Litig.,
    751 F.3d 86 (2d Cir. 2014).................................................................................... 4

Katz v. Am. Mayflower Life Ins. Co. of N.Y.,
    14 A.D.3d 195 (1st Dept. 2004)............................................................................ 43

**(CASES CONT.):**

Kraatz v. USAA Cas. Ins. Co.,
No. 16-CV-00103-FPG, 2017 WL 876187 (W.D.N.Y. Mar. 6, 2017).....................................40

La Liberte v. Reid,
966 F.3d 79 (2d Cir. 2020)........................................................................................41

Littlejohn v. City of New York,
795 F.3d 297 (2d Cir. 2015).......................................................................................10

Litwin v. Blackstone Grp, L.P.,
634 F.3d 706 (2d Cir. 2011).......................................................................................10

Malaube, LLC v. Greenwich Insurance Co.,
(S.D. Fla., Case No. 1:20-cv-22615) ..........................................................................21

Manley v. AmBase Corp.,
337 F.3d 237 (2d Cir. 2003).......................................................................................18

Maska U.S., Inc. v. Kansa Gen. Ins. Co.,
198 F.3d 74 (2d Cir. 1999).........................................................................................4

Matzner v. Seaco Ins. Co.,
9 Mass. L. Rptr. 41 (Mass. 1998) ........................................................................25, 27

Mellin v. Northern Security Insurance Company, Inc.,
167 N.H. 544 (N.H. 2015) ........................................................................................25

Motorists Mutual Ins. Co. v. Hardinger,
131 F. App'x 823 (3rd Cir. 2005) .........................................................................25, 30

Nautilus Group, Inc. v. Allianz Glob. Risks U.S.,
2012 WL 760940 (W.D. Wash. 2012) .........................................................................18

New York Univ. v. Cont. Ins. Co.,
87 N.Y.2d 308 (N.Y. 1995) .................................................................................40, 41

Newman Myers Kreines Gross Harris, P.C. v. Great Northern Ins.,
17 F. Supp. 3d 323 (S.D.N.Y. 2014).......................................................................29, 30

Northville Indus. Corp. v. Natl. Union Fire Ins. Co. of Pittsburgh, Pa.,
89 N.Y.2d 621 (N.Y. 1997) .......................................................................................18

Omni Berkshire Corp. v. Wells Fargo Bank, N.A.,
307 F. Supp. 2d 534 (S.D.N.Y. 2004)........................................................................3, 4

Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.,
368 F. Supp. 1098 (S.D.N.Y. 1973)........................................................................14, 15

**(CASES CONT.):**

Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.,
  505 F.2d 989 (2d Cir. 1974)........................................................................... 15, 16, 41

Parks Real Est. Purch. Grp. v. St. Paul Fire and Mar. Ins. Co.,
  472 F.3d 33 (2d Cir. 2006)........................................................... 4, 11, 12, 23, 24, 31

Pepsico, Inc. v. Winterthur Intl. Am. Ins. Co.,
  24 A.D.3d 743 (2d Dept. 2005) ................................................................... 22, 23, 31

Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,
  602 F.3d 57 (2d Cir. 2010)..................................................................................... 10

Port Authority of N.Y. and N.J. v. Affiliated FM Ins. Co.,
  311 F.3d 226 (3d Cir. 2002)..................................................................................... 24

Quadrant Structured Products Co., Ltd. v. Vertin,
  23 N.Y.3d 549 (N.Y. 2014) ............................................................................... 12, 14

Reiss v. Fin. Performance Corp.,
  97 N.Y.2d 195 (N.Y. 2001) ..................................................................................... 34

Reyes v. Metromedia Software, Inc.,
  840 F. Supp. 2d 752 (S.D.N.Y. 2012) ..................................................................... 18

Riordan v. Nationwide Mutual Fire Ins. Co.,
  977 F.2d 47 (2d Cir. 1992)....................................................................................... 40

Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.,
  13 N.Y.3d 398 (N.Y. 2009) ..................................................................................... 34

Rose's 1, LLC v. Erie Ins. Exch.,
  (D.C. Super. Ct. Case No. 2020 CA 002424 B) (Doc. 11-7)............................... 29, 31

Roundabout Theatre Co., Inc. v. Continental Cas. Co.,
  302 A.D.2d 1 (1st Dept. 2002)............................................................... 28, 29, 30

SatisPie, LLC v. Travelers Property Casualty Company,
  --- F.Supp.3d ----, 2020 WL 1445874 (W.D.N.Y., March 25, 2020) ................................ 29, 30

Schlamm Stone & Dolan, LLP v. Seneca Ins. Co.,
  800 N.Y.S. 2d 356, 6 Misc. 3d 1037(A) (N.Y. Sup. Ct., N.Y. Cnty. 2005)................. 22, 23, 31

Sentinel Management Co. v. New Hampshire Ins. Co.,
  563 N.W.2d 296 (Minn. 1997)................................................................................. 26

Social Life Magazine, Inc. v. Sentinel Ins. Co., Ltd.,
  (S.D.N.Y. Case No. 20-cv-3311) ............................................................................. 29

Studio 417, Inc. et al. v. The Cincinnati Ins. Co.,
  No. 20-cv-03127, ---F. Supp. 3d.---, 2020 WL 4692385 (W.D. Mo. Aug. 12, 2020).. 20, 21, 36

**(CASES CONT.):**

Succo v. First Reliance Std. Life Ins. Co.,
   16 F. App'x 53 (2d Cir. 2001) ................................................... 19

Total Intermodal Services Inc. v. Travelers Prop. Cas. Co. of Am.,
   2018 WL 3829767 (C.D. Cal. 2018).......................................... 18

TRAVCO Ins. Co. v. Ward,
   715 F. Supp. 2d 699 (E.D. Va. 2010), aff'd, 504 F. App'x 251 (4th Cir. 2013)...................... 25

Universal Am. Corp. v. Natl. Union Fire Ins. Co. of Pittsburgh, Pa.,
   25 N.Y.3d 675 (N.Y. 2015) ....................................................... 11

Universal Image Productions, Inc. v. Chubb Corp.,
   703 F. Supp. 2d 705 (E.D. Mich. 2010)................................. 26, 27

Universal Image Productions, Inc. v. Fed. Ins. Co.,
   475 F. App'x 569 (6th Cir. 2012) ............................................ 27

Warren v. Mariner Fin., LLC,
   16-CV-221, 2020 WL 4676658 (W.D.N.Y. Aug. 12, 2020) ............................................. 40, 43

Western Fire Ins. Co. v. First Presbyterian Church,
   165 Colo. 34 (Colo. 1968) ..................................................... 26, 27

WTC Captive Ins. Co., Inc. v. Liberty Mut. Fire Ins. Co.,
   549 F. Supp. 2d 555 (S.D.N.Y 2008)........................................ 16


**WEBSITES:**

CENTERS FOR DISEASE CONTROL AND PREVENTION,
   https://www.cdc.gov/nchs/data/icd/Announcement-New-ICD-code-for-
   coronavirus-3-18-2020.pdf (last visited Sep. 30, 2020) ............................................. 6

CENTERS FOR DISEASE CONTROL AND PREVENTION,
   https://www.cdc.gov/nceh/radiation/emergencies/contamination.htm
   (last visited Sep. 30, 2020)........................................................ 17

DICTIONARY.COM,
   https://www.dictionary.com/browse/loss (last visited Sep. 30, 2020)...................................... 19

DICTIONARY.COM,
   https://www.dictionary.com/browse/prohibit?s=t (last visited Sep. 30, 2020)........................ 35

DICTIONARY.COM,
   https://www.dictionary.com/browse/access?s=t (last visited Sep. 30, 2020) .......................... 35

MERRIAM-WEBSTER,
   https://www.merriam-webster.com/dictionary/loss (last visited Sep. 30, 2020)..................... 19

## PRELIMINARY STATEMENT

The presence of the novel coronavirus and the disease COVID-19 (collectively "COVID-19" or the "Virus") at an insured's property constitutes "direct physical loss of or damage to" that property. The instant case presents an issue faced by thousands of businessowners across the country: insurance carriers erroneously refusing to cover business interruption losses caused by the presence of the Virus at insured locations.

Plaintiffs Hutch & Associates, Inc. d/b/a Hutch's Restaurant ("Hutch") and Delaware Restaurant Holdings, LLC d/b/a Remington Tavern & Seafood Exchange ("Remington") (collectively "Plaintiffs" or the "Insureds") submit this Memorandum of Law, on behalf of themselves and a class of plaintiffs, in opposition to Defendants Erie Insurance Company of New York, Erie Indemnity Company d/b/a Erie Insurance Group, Erie Insurance Company, Erie Insurance Property & Casualty Company, Erie Insurance Exchange, and Flagship City Insurance Company's (collectively "Defendants" or "Erie" or the "Insurers") motion seeking to dismiss the claims against them pursuant to FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6).

"The purpose served by business interruption coverage cannot be clearer—to ensure that [an insured] has the financial support necessary to sustain its business operation in the event disaster occurred." Bi-Economy Mkt., Inc. v. Harleysvill Ins. Co. of N.Y., 10 N.Y.3d 187, 194 (N.Y. 2008). Defendants issued Plaintiffs business interruption insurance policies covering "all risks" that cause "direct physical loss of or damage to" their property,[1] unless specifically excluded or limited. The policies do not exclude or limit virus-related losses even though Defendants issued policies to other policyholders wherein they expressly excluded coverage for virus-related losses.

---

[1] The policy language requiring "direct physical loss of or damage to" property shall hereinafter be defined as the "Physical Loss Language".

Plaintiffs and the proposed class members dutifully paid policy premiums for all-risk business interruption policies. Yet, now that "disaster occurred," Defendants and insurance carriers nationwide are not providing "the financial support necessary to sustain [the insureds'] business operation," but rather are universally and categorically denying coverage.

For instance, Defendants challenge coverage in the instant case and assert that dismissal of Plaintiffs' claims is required because the presence of COVID-19 is not and/or could never cause "direct physical loss of or damage to" property, as a matter of law. Defendants argue the Physical Loss Language should be interpreted, as a matter of law, to require permanent, observable physical alteration to covered property. Defendants' position is unsound and incorrect.

First, Defendants' interpretation ignores more than 50 years of case law rejecting that the Physical Loss Language requires physical alteration to property, including numerous cases holding that the presence of illness- and disease-causing agents can constitute and/or cause direct physical loss of or damage to property. Despite that long-standing case law, Defendants did not take the simple step of defining "direct physical loss of or damage to" property in the policies as requiring physical alteration.

Second, Defendants' interpretation ignores that the policies specifically exclude other harmful substances and materials that do not cause physical alteration. Defendants' interpretation would render those exclusions meaningless in violation of well-settled principles of contract construction.

Third, Defendants' interpretation ignores that, since 2006, the insurance industry, including Defendants, have commonly used an exclusion in insurance policies, which are the same as or substantially similar to Plaintiffs' policies, to specifically exclude coverage for "direct physical loss of or damage to" property "caused by or resulting from any virus, bacterium, or other

microorganism that induces or is capable of inducing physical distress, illness or disease" (the "Virus Exclusion"). Defendants' conscious and intentional omission of the Virus Exclusion from the policies at issue requires a finding that policies cover virus-related losses.

Pursuant to the subject policies and rules governing contract interpretation, the policies do cover damages and losses resulting from the presence of COVID-19 at the covered property. Based on the foregoing and the arguments detailed below, Defendants' motions to dismiss must be denied because Plaintiffs' allegations, which must be taken as true, state plausible claims for relief. In particular, the presence of the Virus is and/or could cause "direct physical loss of or damage to" property as those terms are interpreted under governing legal authority.

Plaintiffs' allegations are at least sufficient to allow Plaintiffs to proceed to discovery and develop the factual record related to Defendants' conduct in drafting, issuing, and administering the subject insurance policies and claims submitted thereunder, as well as the losses, damages, and impacts resulting from the presence of the Virus at, in, throughout, and on the subject properties.

## **BACKGROUND**

### A.   **Factual Background**

The facts relevant to this lawsuit are detailed in Plaintiffs' Amended Complaint ("Complaint") (Doc. 9), which, as discussed below, for the purposes of this motion, must be accepted as true and construed in Plaintiffs' favor.

1.   "All Risk Insurance Policies and the Industry-Wide Virus Exclusion"

Defendants issued Plaintiffs all-risk commercial property insurance policies.

"All risk" insurance is property insurance that covers damage resulting from all risks other than those that are specifically excluded from coverage; if a risk is not specifically excluded, it is deemed covered. Typical exclusions found in "all risk" policies are war, pollution, earthquake, and flood. Over time, the standards of the insurance industry have changed in this respect. For example, in the mid to late 1990s, the "Y2K" exclusion was introduced to exclude damages resulting from the

> failure of computer systems to recognize the year 2000. Another exclusion that has developed in recent years is a mold exclusion, excluding damage caused by mold in buildings. The development of the terrorism exclusion after 9/11 is yet another example of a change in industry standards. Over time, "all risk" policies will vary.

Omni Berkshire Corp. v. Wells Fargo Bank, N.A., 307 F. Supp. 2d 534, 538 (S.D.N.Y. 2004). As explained by the Second Circuit, "[u]nder an all-risk policy, losses caused by *any* fortuitous peril not specifically excluded under the policy will be covered." Parks Real Est. Purch. Grp. v. St. Paul Fire and Mar. Ins. Co., 472 F.3d 33, 41 (2d Cir. 2006); see also In re September 11 Litig., 751 F.3d 86, 92-93 (2d Cir. 2014) ("The purpose of an all-risk insurance contract is to protect against any insurable loss not expressly excluded by the insurer or caused by the insured.").

All-risk policies (as opposed to specific peril policies) cover all perils unless specifically excluded and have evolved over time as insurance companies added exclusions for specific, otherwise-covered risks. One of the more recently "added" exclusions is for virus-related losses.

In 2006, the U.S. all-risk insurance industry adopted a virus exclusion excluding property losses "caused by or resulting from any virus, bacterium, or other microorganism that induces or is capable of inducing physical distress, illness or disease" (the "Virus Exclusion"). (Berloth Decl. Ex. 1). The creation and adoption of the Virus Exclusion was in response to (i) cases nationwide finding that the presence of illness- and disease-causing agents constitutes and causes direct physical loss of or damage to property, (ii) the outbreak of the severe acute respiratory syndrome ("SARS") in other parts of the world—a viral respiratory illness caused by the SARS-associated coronavirus, and (iii) business interruption claims and coverage arising therefrom. Id. at Exs. 7-9.

The Virus Exclusion was developed by the Insurance Services Office ("ISO"), "an insurance trade association authorized to act on behalf of its member insurance companies." Maska U.S., Inc. v. Kansa Gen. Ins. Co., 198 F.3d 74, 80 (2d Cir. 1999); Ball v. U.S. Fid. & Guar. Co., 1989 WL 135903, at *1 (S.D.N.Y. 1989) ("ISO is an organization providing services to the

property-casualty insurance industry in connection with the adoption of forms and practices.”). The Virus Exclusion has been available and widely used in the industry to exclude coverage for direct physical loss of or damage to property caused by a virus since 2006.

Defendants are members of ISO and have access to ISO forms and exclusions. (See, e.g., Doc. 9-1 [*Hutch Policy*], pp. 80 (demonstrating that many of Defendants’ policy forms are copyrighted by the “Insurance Services Office, Inc.”); Doc. 9-2 [*Remington Policy*], pp. 86, 92, 94-98, 106, 110-13, & 119 (same)). In fact, using the same all-risk policy forms issued to Plaintiffs, Defendant sold policies to non-party policyholders, but included a virus exclusion specifically excluding “direct physical ‘loss’ of or damage to covered property” that is “caused . . . [b]y or resulting from any virus, bacterium, or other microorganism that induces or is capable of inducing physical distress, illness, or disease.” (Doc. 9-3 [*Am. Complaint, Ex. C*]). It is undisputed that such an exclusion is not part of Plaintiffs’ Policy.

2.   The Policies

The subject policies are commercial property all-risk policies that cover “direct physical ‘loss’ of or damage to Covered Property at the premises . . . , except ‘loss’ as excluded or limited in this policy.” (Doc. 9-1 [*Hutch Policy*], pp. 13. 45; Doc. 9-2 [*Remington Policy*], pp. 19, 51).[2] “Covered Property” includes Defendants’ premises, buildings, anything attached thereto, and the contents of the buildings, including equipment, fixtures, and personal property. (Doc. 9-1 [*Hutch Policy*], p. 10; Doc. 9-2 [*Remington Policy*], p. 16). The Policy covers all lost income “you sustain due to partial or total ‘interruption of business’” resulting from such physical loss of or damage to

_____

[2]     The Plaintiffs’ insurance policies shall be collectively referred to as the “Policy” as they are the same insurance contract, with the exception that (a) the docket pagination may be different due to the varying lengths of each Plaintiff’s declaration pages preceding respective, substantive Policy terms, and (b) the inclusion, or lack thereof, of certain irrelevant and inapplicable exclusion forms.

the covered property. Doc. 9-1 [*Hutch Policy*], p. 12; Doc. 9-2 [*Remington Policy*], p. 18).

The Policy does *not*: (a) define what constitutes either "direct physical 'loss' of or damage to" covered property; (b) provide that physical alteration of property is (i) an element or aspect of the definition of "direct physical 'loss' of" or "damage to" property, or (ii) a condition precedent to coverage being afforded therefor; or (c) include any form of a virus exclusion.

The Policy also provides for "Civil Authority" insurance covering lost business income "caused by action of civil authority that prohibits access to the [insured's] premises" as a result of "damage to property other than property at the [insured's] premises" that is "within . . . one mile" of the insured's premises. (Doc. 9-1 [*Hutch Policy*], p. 13; Doc. 9-2 [*Remington Policy*], p. 19). The Civil Authority coverage includes losses arising from civil authority action "in response to dangerous physical conditions resulting from the damage *or* continuation of the peril insured against that caused the damage." Id. (emphasis added).

3.   The Novel Coronavirus, COVID-19, and Authorities' Treatment of the Same

The novel coronavirus is a virus that causes the disease COVID-19. The Virus is highly contagious and progressed into and caused a global pandemic. The World Health Organization ("WHO") declared the COVID-19 outbreak a public health emergency of international concern on January 30, 2020, and declared COVID-19 a pandemic on March 11, 2020. On March 13, 2020, a national emergency was declared in the U.S. concerning the COVID-19 outbreak. See CENTERS FOR DISEASE CONTROL AND PREVENTION ("CDC"), https://www.cdc.gov/nchs/data/icd/Announc ement-New-ICD-code-for-coronavirus-3-18-2020.pdf (last visited Sep. 30, 2020).

The presence of COVID-19 caused civil authorities throughout New York to issue executive orders declaring a disaster emergency and requiring the suspension of business operations and use of commercial property. Pursuant to New York State Executive Orders, all non-

essential, on-site workers were reduced by: (a) fifty percent (50%), effective March 20, 2020; (b) seventy-five percent (75%), effective March 21, 2020; and (c) one-hundred percent (100%), effective March 22, 2020 (collectively the "NYS Shutdown Orders"). (Berloth Decl. Exs. 12, 13, & 14). New York City Executive Orders ("NYC Executive Orders"), issued in relation to and to carry out the NYS Shutdown Orders, expressly declared that "the virus *physically is causing property loss and damage*." (Doc. 9-6 [*NYC Executive Orders*], pp. 3 & 6 (emphasis added)).

States throughout the country issued similar executive orders shutting down businesses. For example, Pennsylvania Governor Wolf issued an executive order "compelling the closure of the physical operations of all non-life-sustaining business." Friends of Danny DeVito v. Wolf, 227 A.3d 872, 876 (Pa. 2020). In Friends of DeVito, the Pennsylvania Supreme Court rejected a challenge to the governor's power to issue the shut-down order, holding that the Virus is a "natural disaster," and finding COVID-19 to be a "catastrophe which *results in substantial damage to property*, hardship, suffering or possible loss of life." Id. at 887-89 (emphasis added). The court explained that "the COVID-19 pandemic is of the same general nature or class as those specifically enumerated" in the Emergency Code, including "hurricane, tornado, storm . . . tidal wave, earthquake, fire, [and] explosion," and "[t]he COVID-19 pandemic is, by all definitions, a natural disaster and a catastrophe of massive proportions." Id. at 888-89.

The court also rejected the petitioner's argument that its business was not in a "disaster area", explaining that COVID-19 is ubiquitous. Id. In particular, the Court explained:

> The virus spreads primarily through person-to-person contact, has an incubation period of up to fourteen days, one in four carriers of the virus are asymptomatic, and the virus can live on surfaces for up to four days. Thus, any location (including Petitioners' businesses) where two or more people can congregate is within the disaster area.

Id. at 889-90; see also id. at 891 ("The virus can live on surfaces for up to four days and can remain in the air within confined areas and structures.").

Since Friends of DeVito was decided in April 2020, the study and scientific analysis of the Virus has been ongoing. While the initial focus was on person-to-person transmission, current scientific evidence shows that COVID-19 is spread from exposure to air and surfaces in buildings. (Berloth Decl. Exs. 16-23). Studies show that COVID-19 can remain viable and infectious on surfaces for days. Id. at 18. A recent study found that infection of a person that started with a single elevator button spread the virus to up to seventy-one (71) other people. Id. at 20.

Infectious airborne droplets and smaller aerosols can remain suspended in the air for hours after release, and thereafter settle on surfaces and floors and remain for days, are a major source of COVID-19 transmission. Id. at Exs. 16-23. In addition to talking, coughing, or sneezing, such infection aerosols are released simply by exhaling. These airborne, infectious COVID-19 particles can travel many meters through air current and spread through air ducts and pipes, before settling on a building's surfaces. Id. Based on the foregoing, the risk of infection inside a building is up to nineteen times (19x) higher than open-air environments. Id. at Ex. 21.

4.    The Loss and Denial of Claim

COVID-19 was present at, in, throughout, and on Plaintiffs' covered property, including Plaintiffs' premises, buildings, contents, equipment, fixtures, and personal property (collectively "Covered Property").[3] (Doc. 9 [*Am. Complaint*], ¶¶ 63-66). The presence of the Virus is and causes direct physical loss of and/or damage to Plaintiffs' Covered Property. Id. at ¶¶ 61, 67, & 69.

---

[3]    The definition of "Covered Property" is not intended to limit or otherwise prejudice Plaintiffs in their claims by including or excluding by reference items that may or may not be "covered" under the Policy. Rather, "Covered Property" is a definition used for purposes of convenience of reference.

In March 2020, Plaintiffs ceased business operations and suffered business interruption losses as a result of the presence of COVID-19 at their Covered Property, the resulting direct physical loss of and/or damage to Plaintiffs' Covered Property, and the NYS Shutdown Orders relating to such loss and damage.

Plaintiffs filed claims under the Policy seeking coverage for losses related to the Virus. Both Plaintiffs received substantially the same denial from Defendants, providing, *inter alia*: "We regret to inform you that there is no coverage for your loss of income because there is no direct physical loss to your building or business personal property." (Doc. 9-4 [*Hutch Denial*]; Doc. 9-5 [*Remington Denial*]).

**B.** **Procedural History**

On May 21, 2020, Plaintiffs initiated this action by filing a Summons and Complaint in the State of New York Supreme Court. (Doc. 1-1). On July 15, 2020, Defendants removed this action to this Court. (Doc. 1). On July 22, 2020, Defendants filed a motion seeking to dismiss Plaintiffs' claims pursuant to FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) (collectively the "RULES" or each a "RULE"). (Doc. 3). On August 12, 2020, Plaintiffs filed an Amended Complaint (the "Complaint"). (Doc. 9). The Complaint states causes of action against Defendants for (1) Breach of Contract and Declaratory Relief and (2) violations of New York General Business Law § 349. Id. On September 2, 2020, Defendants filed the instant motion seeking to dismiss the Complaint pursuant to RULE 12(b)(6) (the "Motion to Dismiss").

For the reasons discussed below, Defendant's Motion to Dismiss must be denied.

## ARGUMENT

POINT I

LEGAL STANDARDS

### A.    Motion to Dismiss Standard

"On a motion to dismiss, all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." Littlejohn v. City of New York, 795 F.3d 297, 306 (2d Cir. 2015) (citations omitted). "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991).

"[A] motion to dismiss does not involve consideration of whether a plaintiff will ultimately prevail on the merits, but instead solely whether the claimant is entitled to offer evidence in support of his claims." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 65 (2d Cir. 2010) (quotations and citations omitted).

> To survive a motion to dismiss, a complaint must plead enough facts to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

Litwin v. Blackstone Grp, L.P., 634 F.3d 706, 715 (2d Cir. 2011).

Based on the arguments set forth below, Defendants' motion to dismiss must be denied because (i) Plaintiffs' allegations, which must be taken as true, state plausible claims for relief and (ii) Defendants' repeated assertions that Plaintiffs "fail to plead" certain elemental facts are false. The Policy provides coverage for COVID-19-related business interruption losses. Specifically, the presence of the Virus is, and causes, "direct physical loss of or damage to" Covered Property pursuant to governing legal authority and established legal principles.

At the very least, Plaintiffs' allegations are sufficient to allow Plaintiffs to proceed to discovery and develop the factual record related to (a) Defendants' conduct in drafting, issuing, and administering the subject insurance policies (and the systemic inconsistencies and failures thereof) and claims submitted thereunder, as well as (b) the loss and damage resulting from the presence of COVID-19 at, in, throughout, and on the Covered Property.

## B.     Insurance Policy Interpretation Standard

New York substantive law applies because there are no federal questions and because New York has the greatest interest in the instant litigation. See Erie R.R. v. Thompkins, 304 U.S. 64, 78 (1938) (holding that state substantive law applies absent a federal question); Employers' Liability Assurance Corp. v. Aresty, 11 A.D.2d 331, 333 (1st Dept. 1960) (holding that New York law applies in interpreting insurance policies where the parties intended New York to be the place of performance at the time of execution of the policy).

Under New York Law, "[a]n insurance agreement is subject to principles of contract interpretation." Universal Am. Corp. v. Natl. Union Fire Ins. Co. of Pittsburgh, Pa., 25 N.Y.3d 675, 680 (N.Y. 2015). "When a dispute arises involving the terms of an insurance contract, New York insurance law provides that an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." Parks Real Estate, 472 F.3d at 42 (quotations and citations omitted). "Whether a contract is ambiguous is a threshold question of law to be determined by the court." Duane Reade, Inc. v. St. Paul Fire and Mar. Ins. Co., 411 F.3d 384, 390 (2d Cir. 2005).

"An ambiguity exists where the terms of an insurance contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages

and terminology as generally understood in the particular trade or business." <u>Parks Real Estate</u>, 472 F.3d at 42 (quotations and citations omitted).

"Under New York law, moreover, a policy must ... be construed in favor of the insured, and ambiguities, if any, are to be resolved in the insured's favor and against the insurer." <u>Duane Reade</u>, 411 F.3d at 390; <u>see also</u> <u>Parks Real Estate</u>, 472 F.3d at 42 ("[i]f the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer.").

Moreover, "[a]n insurance contract should not be read so that some provisions are rendered meaningless." <u>County of Columbia v. Cont. Ins. Co.</u>, 83 N.Y.2d 618, 628 (N.Y. 1994). Rather, "[t]he rules of contract construction require [the Court] to adopt an interpretation which gives meaning to every provision of the contract." <u>GSI Commerce Sols., Inc. v. BabyCenter, L.L.C.</u>, 618 F.3d 204, 214 (2d Cir. 2010).

As explained by the New York Court of Appeals, it is a crucial principle of insurance contract interpretation that:

> if parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—<u>*the inescapable conclusion is that the parties intended the omission*</u>. The maxim *expressio unius est exclusio alterius*, as used in the interpretation of contracts, supports precisely this conclusion.

<u>Quadrant Structured Products Co., Ltd. v. Vertin</u>, 23 N.Y.3d 549, 560 (N.Y. 2014) (emphasis in underline and italics added). This rule not only defeats Defendants' present motion, but supports the eventual grant of summary judgment in Plaintiffs' favor.

As discussed below, these governing principals of contract interpretation, as applied to the subject Policy, do not support Defendants' interpretation that "direct physical loss of or damage to" property requires observable physical alteration; rather, they support that the presence of COVID-19 is inherently, and causes, "direct physical loss of or damage to" property. As evidenced

by (i) the industry's adoption of the Virus Exclusion and (ii) the policy interpretation accepted by numerous learned courts across the Country on this very issue (see infra, POINT II.B.2), the Policy must be construed in Plaintiffs' such that the unavoidable conclusion is that the Policy provides coverage for Plaintiffs' Virus-related business interruption losses.

POINT II

PLAINTIFFS STATE A VIABLE CLAIM FOR DIRECT PHYSICAL LOSS OF OR DAMAGE TO THE COVERED PROPERTY AS A RESULT OF THE PRESENCE OF COVID-19

Defendants argue that Plaintiffs' claim must be dismissed because presence of COVID-19 is not, and cannot cause, "direct physical loss of or damage to" the Covered Property, as a matter of law. Defendants' claim (a) ignores the applicable and well-established case law and (b) is based on Defendants' erroneous interpretation that the Physical Loss Language requires observable alteration to the physical integrity of the Covered Property.

Defendants' argument requires the Court to: (i) ignore that the insurance industry created and adopted the Virus Exclusion because the Physical Loss Language affords coverage for virus-related losses absent an exclusion; (ii) ignore decades of case law rejecting that the Physical Loss Language requires a physical alteration to property; (iii) read definitions into the Policy despite Defendants' omission of the same; and (iv) ignore that Defendants actively included exclusionary language for viruses in certain policies *while omitting that same language in Plaintiffs' Policy*.

**A.**     **Defendants' interpretation of the Physical Loss Language is inconsistent with the terms of the Policy and renders numerous provisions meaningless.**

Defendants' arguments—that "direct physical loss of or damage to" property does not include losses causes by COVID-19 because it requires physical alteration to the Covered Property—are inconsistent with the rest of the Policy and violate controlling principals of contractual interpretation. Specifically, Defendants cannot overcome that: (1) they failed to include a virus exclusion in the Policy despite (a) their knowledge of the existence of virus exclusions,

- 13 -

and, indeed, (b) their own issuance of policies containing virus exclusions to other policyholders; (2) their reading of the Policy renders various exclusions and limitations in the Policy meaningless and superfluous; and (3) their interpretation of the Physical Loss Language equates "direct physical loss" with "direct physical damage," thereby reading one of the provisions out of the Policy.

      1.    <u>Defendants knowingly failed to include a virus exclusion in the Policy.</u>

New York law is well-settled:

> if parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission. The maxim *expressio unius est exclusio alterius*, as used in the interpretation of contracts, supports precisely this conclusion.

<u>Quadrant Structured</u>, 23 N.Y.3d at 560.

This rule was applied by the Southern District of New York where the court considered a coverage dispute under all-risk policies for losses arising from an aircraft hijacking. <u>Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.</u>, 368 F. Supp. 1098 (S.D.N.Y. 1973). The insurers argued that the loss was not covered due to exclusions, including exclusions for military seizure, war, insurrection, and civil commotion. <u>Id.</u> at 1117. The court rejected the insurers' arguments. <u>Id.</u>

The Court explained that "hijacking risk" was known in the industry, that exclusions specific to hijacking risks were developed and adopted in the industry, and that inclusion of a hijacking exclusion in the subject all-risk policies would have unambiguously excluded the loss at issue. <u>Id.</u> at 1119-1121. The court further explained that the industry's development of the hijacking exclusion evidenced that "insurers themselves recognized the ambiguities in their ancient, boiler-plate clauses and themselves exhibited the consequent uncertainties." <u>Id.</u> at 1118.

The <u>Pan Am.</u> court therefore held that the all-risk policies covered the loss arising from hijacking, finding it "significant" that (1) the risk was "well known when the insurance was written", (2) there were "expressions known to the insurers, considered by them, and used in other

policies by some of them or others in the industry that described this kind of risk with clarity and precision", and (3) the insures did not include a hijacking exclusion in the policies. Id. In sum, the all risk policy covered the "hijacking loss" because the carrier did not include the known exclusion for such losses.

> The Second Circuit affirmed the decision, holding, in pertinent part:
>
> The maxim contra proferentem receives added force in this case because the all risk insurers knew that their exclusions were ambiguous in the context of a political hijacking, and *they knew of but did not employ exclusionary terms used by other all risk insurers which would have clarified the ambiguity* . . . . [I]t is not sufficient for the all risk insurers' case for them to offer a reasonable interpretation under which the loss is excluded; they must demonstrate that an interpretation favoring them is *the only reasonable reading* of at least one of the relevant terms of exclusion.
>
> *Contra proferentem has special relevance as a rule of construction <u>when an insurer fails to use apt words to exclude a known risk</u>*. The evidence indicates that the risk of a hijacking was well known to the all risk insurers . . . .

Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co., 505 F.2d 989, 1000 (2d Cir. 1974) (emphasis added) (hereinafter "Pan Am. II"). The Second Circuit explained that "various clauses which would have excluded the present loss were in common use" and that, "[w]hen the all risk insurers failed to exclude" losses arising from hi-jacking, "they acted at their own peril." Id.

Here, as in Pan Am., Defendants and the rest of the all-risk insurance industry recognized that the presence of a virus constitutes "physical loss of or damage to" property. (Berloth Decl. Exs. 2-6). It is undisputed that the Virus Exclusion was created, adopted by, and available to Defendants and other insurers nationwide since 2006. Like the hijacking exclusion in Pan Am., insurers in the industry have included the Virus Exclusion in similar all-risk property casualty policies. Id. Here, Defendants chose not to include the Virus Exclusion and, as explained by the Second Circuit, "acted at their own peril." Pan Am. II, 505 F.2d at 1000.

The rationale for the Virus Exclusion to be created, adopted, and included in such policies is that the presence of a virus is covered because it is or causes "direct physical loss of or damage

to" property. Thus, the industry developed a Virus Exclusion to be used by insurers who intend to exclude virus-related losses from coverage. Id.

Defendants decided not to use that known Virus Exclusion "at their own peril." Pan Am., 505 F.2d at 1000; see also WTC Captive Ins. Co., Inc. v. Liberty Mut. Fire Ins. Co., 549 F. Supp. 2d 555 (S.D.N.Y 2008) ("enough was known by the underwriters to enable them to write specific exclusions if, indeed, they truly intended to exclude specified risks . . . . *The [] Insurers failed to write such a specific exclusion. They cannot now ask the court to remedy their failure.*" (emphasis added)); Greaves v. Pub. Serv. Mut. Ins. Co., 5 N.Y.2d 120, 125 (N.Y. 1959) ("this policy was written by the insurer and any ambiguity is to be resolved against it. *If the intent was to exclude liability* to any injured person who was covered by any workmen's compensation insurance *it would have been easy to say so.*" (emphasis added)). Defendants' omission of the industry-wide Virus Exclusion from the Policy requires a finding that the Policy covers virus related losses.

Moreover, Defendants were not merely aware of the existence of virus exclusions, they actually included virus exclusions in similar all-risk policies issued to other policyholders. (Doc. 9-3, pp. 28 & 31). Thus, the instant case presents an even more compelling situation than Pan Am. and WTC because Defendants did not merely "[know] of but did not employ exclusionary terms used by *other* all risk insurers which would have clarified the ambiguity." Pan Am., 505 F.2d at 1000 (emphasis added). Instead, Defendants "knew of but did not employ exclusionary terms" *they actually used directly* "which would have clarified the ambiguity." Id.

> 2.  Defendants' interpretation of the Policy renders various exclusions and limitations in the Policy meaningless and superfluous.

Under Defendants' interpretation of the Physical Loss Language—as requiring physical alteration of property—specific exclusions and limitations in the Policy would be superfluous and rendered meaningless, in violation of well-settled rules of contractual interpretation. County of

Columbia, 83 N.Y.2d at 628 ("An insurance contract should not be read so that some provisions are rendered meaningless."). For instance, the Policy specifically excludes or limits from coverage numerous risks that do not alter the physical integrity of property, including: (i) "[a]sh, dust, or particulate matter"; (ii) "radiation"; (iii) "radioactive contamination"; (iv) "Damp or dry air"; (v) "Smog"; (vi) "Smoke"; (vii) "vapor"; (viii) "gases"; (ix) "the presence of condensation of humidity, moisture or vapor"; and (x) "dust" (the foregoing being defined as examples of "*Non-Physically Altering Losses*"). (Doc. 9-1 [*Hutch Policy*], pp. 13-16; Doc. 9-2 [*Remington Policy*], pp. 19-22). Those exclusions and limitations all apply to the same coverage at issue here, requiring "direct physical loss of or damage to" the Property. Id.

For example, radiation (a) causes illness, but "cannot be seen, smelled, felt, or tasted," (b) can contaminate, among other things, "air, water, surfaces, soil, plants, buildings, people," (c) "can spread the contamination by touching surfaces, sitting in a chair, or even walking through a house," and (d) can be spread from person-to-person or from the "surfaces that they touch." (See CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/nceh/radiation/ emergencies/contamination.htm (last visited Sep. 30, 2020). The Virus is directly analogous to radiation, insomuch as both cause "direct physical loss of or damage to the property"; however, radiation, unlike the Virus, is expressly excluded from coverage under the same all-risk policy.

If the Physical Loss Language necessitates a physical alteration of property, then risks such as radiation would not require specific exclusions. The Policy "should not be read so that [these] provisions are rendered meaningless." County of Columbia, 83 N.Y.2d at 628.

3.   Defendants interpretation of the Policy impermissibly equates "direct physical loss" with "direct physical damage."

Defendants' interpretation that "direct physical loss of or damage to" property includes only physical alteration to property ignores that the Policy expressly includes both "direct physical

'loss' of **_or_** damage to Covered Property at the premises." (Doc. 9-1 [*Hutch Policy*], p. 10; Doc. 9-2 [*Remington Policy*], p. 16 (emphasis added)). The Court must give meaning to both the terms "loss of" and "damage to." Northville Indus. Corp. v. Natl. Union Fire Ins. Co. of Pittsburgh, Pa., 89 N.Y.2d 621, 632 (N.Y. 1997) ("[C]ourts, in interpreting insurance policies, should strive to give meaning to every sentence, clause, and word of a contract of insurance.").

If Defendants' interpretation is accepted—that both "direct physical loss of" and "direct physical damage to" are singularly defined as physical alteration of the property—then either "loss of" or "damage to" would be rendered meaningless. That interpretation would run afoul of "the cardinal rule that a contract should not be read to render any provision superfluous." Reyes v. Metromedia Software, Inc., 840 F. Supp. 2d 752, 756 (S.D.N.Y. 2012); see Manley v. AmBase Corp., 337 F.3d 237, 250 (2d Cir. 2003).

For example, in Total Intermodal Services Inc. v. Travelers Prop. Cas. Co. of Am., 2018 WL 3829767 (C.D. Cal. 2018), the court rejected that "direct physical loss of or damage to" property meant only "damage to" property. The court held:

> to interpret "physical loss of" as requiring "damage to" would render meaningless the "or damage to" portion of the same clause, thereby violating a black-letter canon of contract interpretation—that every word be given a meaning.

Id. at *3; see also Nautilus Group, Inc. v. Allianz Glob. Risks U.S., 2012 WL 760940, at *7 (W.D. Wash. 2012) ("First, if 'physical loss' was interpreted to mean 'damage,' then one or the other would be superfluous. The fact that they are both included in the grant of coverage evidences an understanding that physical loss means something other than damage.").

Even if the language "direct physical damage to" required physical alteration—which Plaintiffs contest—"direct physical loss of" must be given its own meaning. Commonly accepted definitions of "loss" include (1) "detriment, disadvantage, or deprivation from failure to keep,

have, or get"; (2) "the state of being deprived of or of being without something that one has had"; and (3) "the act of losing possession : DEPRIVATION." DICTIONARY.COM, https://www.dictionary.com/browse/loss (last visited Sep. 30, 2020)); MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/loss (last visited Sep. 30, 2020)); see also Succo v. First Reliance Std. Life Ins. Co., 16 F. App'x 53, 55 (2d Cir. 2001) ("A non-legal dictionary can supply the everyday, common meaning.").

Simply put, reading "direct physical loss" as separate and distinct from "direct physical damage" explains why the Policy also contains express exclusions and limitations for certain *Non-Physically Altering Losses*. Insurers include such exclusionary language because the inclusion of "direct physical loss of" and "direct physical damage to" inherently encompass "all risks" covered under the "all risk" Policy.

Therefore, pursuant to the plain meaning of "loss," "direct physical loss of" includes physical deprivation of the Covered Property. It cannot be disputed that Plaintiffs' adequately alleged that the presence of COVID-19, deprived Plaintiffs of their property, making it unsafe and unusable. (Doc. 9 [*Am. Complaint*], ¶¶ 61, 63-66, 67, & 69). Thus, Defendants' Motion to Dismiss should be denied.

**B.     Governing case law supports that COVID-related losses are covered under the Policy.**

Defendants' Motion to Dismiss should be denied because: (1) the courts which have determined this same COVID-19 motion to dismiss, on factually analogous grounds, ruled in the insureds' favor; (2) those decisions are consistent with the long-standing case law demonstrating that physical alteration of property is not required by the Physical Loss Language; and (3) the case law cited by Defendants is inapplicable as it is both legally and factually distinguishable.

1.    <u>The recent COVID-19 Cases support that the presence of COVID-19 is a covered cause of loss.</u>

The United States District Court for the Western District of Missouri recently denied virtually the exact motion to dismiss as is currently before this Court, applying the same constructs of contractual interpretation identified by the Second Circuit and New York Court of Appeals. <u>Studio 417, Inc. et al. v. The Cincinnati Ins. Co.</u>, No. 20-cv-03127, --- F. Supp. 3d ---, 2020 WL 4692385 (W.D. Mo. Aug. 12, 2020). In <u>Studio 417</u>, the all-risk policy covered "accidental [direct] physical loss or accidental [direct] physical damage." <u>Id.</u> at *1 (alterations in original). The insured filed a lawsuit seeking coverage "for losses caused by the Coronavirus ('COVID-19')." <u>Id.</u> at *1-2. Similar to Plaintiffs' allegations herein, the insured alleged that COVID-19 was present at the covered properties, rendered the property and property in its vicinity "unsafe and unusable," forced the insurers "to suspend or reduce business at their covered premises," and that government orders required suspension of business operations. <u>Id.</u> at *2.

Just as Defendants do here, the <u>Studio 417</u> insurance company filed a motion to dismiss under RULE 12(b)(6), claiming failure to allege "direct physical loss" because "direct physical loss requires actual, tangible, permanent, physical alteration of property." <u>Id.</u> at *4.

Applying the same contractual interpretation principles outlined in POINT II.A, <u>supra</u>, the court held that coverage may exist "even absent a physical alteration." <u>Id.</u> at *5. The court explained: (a) the plaintiffs sufficiently pleaded "direct physical loss to the premises and property," because "'COVID-19 'is a physical substance,' that it 'live[s] on' and is 'active on inert physical surfaces,' and is also 'emitted into the air'"; (b) COVID-19 "attached to and deprived Plaintiffs of their property, making it 'unsafe and unusable'"; and (c) "the Plaintiffs expressly allege[d] physical contamination." <u>Id.</u> at *4-6.

In addition, the court held that because the policy covered both "accidental physical loss *or* accidental physical damage," the insurer "conflates 'loss' and 'damage' in support of its argument that the Policies require a tangible, physical alteration." Id. at *5 (emphasis in original). The court ruled that it "must give meaning to both terms" and "'if 'physical loss' was interpreted to mean 'damage,' then one or the other would be superfluous." Id..

The Court also rejected the use of the transcripts from the Social Life preliminary injunction and Gavrillides motion for summary judgment relied on by Defendants. The court held:

> the presence of COVID-19 on premises, as is alleged here, is not a benign condition. Regardless of the allegations in Social Life or other cases, *Plaintiffs here have plausibly alleged that COVID-19 particles attached to and damaged their property, which made their premises unsafe and unusable. This is enough to survive a motion to dismiss*. . . .
> Gavrilides is *distinguishable*, in part, because the court recognized that "the complaint also states *a[t] no time has COVID-19 entered the Soup Shop of the Bistro* . . . and in fact, states that it has never been present in either location."

Studio 417 at *6 and n. 5 (emphasis added).

The Studio 417 decision was favorably cited by the Southern District of Florida, where the court decided a motion on another COVID-19 matter, albeit one factually distinguishable from both the instant case and Studio 417. See Malaube, LLC v. Greenwich Insurance Co., (S.D. Fla., Case No. 1:20-cv-22615). While Defendants cite Malaube in support of their motion—because the court ultimately granted the defendant/insurer's motion to dismiss—the court cited and approved the Studio 417 analysis. The Malaube court then found its case "materially different because Plaintiff has not alleged any physical harm. There is no allegation, for example, that COVID-19 was physical present on the premises." Id. at 15.

An even more recent federal court decision reinforces the Studio 417 decision. See Blue Springs Dental Care, LLC, et al. v. Owners Insurance Co., 20-CV-00383-SRB, ---F. Supp. 3d.---, 2020 WL 5637963, at *1 (W.D. Mo. Sep. 21, 2020). The court denied the insurer's motion to

dismiss the insureds' lawsuit pursuant to RULE 12(b)(6), finding that the insureds "adequately stated a claim for a direct physical loss." Id. at *4. "Taking Plaintiffs' fact allegations as true, as the Court must at this stage, and after drawing reasonable inferences from those facts in their favor, Plaintiffs plausibly allege that COVID-19 physically attached itself to their dental clinics, thereby depriving them of the possession and use of those insured properties." Id. at *4 (citations omitted).

Here, like Studio 417 and Blue Springs, COVID-19 was present at the covered properties and constituted, or caused, physical loss of or damage to the property. (Doc. 9 [*Am. Complaint*], ¶¶ 63-66). Based on the foregoing, Plaintiffs request that the Court follow the well-reasoned decision and analysis in Studio 417 and Blue Springs and deny Defendants' Motion to Dismiss.

2.   Long-standing and well-established case law demonstrates that "physical alteration" is not required to establish "direct physical loss of or damage to" property.

Defendants' coverage position ignores more than fifty (50) years of case law rejecting the argument that the Physical Loss Language requires a perceivable physical alteration to property.

New York courts examined this very issue in Pepsico, Inc. v. Winterthur Intl. Am. Ins. Co., 24 A.D.3d 743 (2d Dept. 2005) and Schlamm Stone & Dolan, LLP v. Seneca Ins. Co., 800 N.Y.S. 2d 356, 6 Misc. 3d 1037(A) (N.Y. Sup. Ct., N.Y. Cnty. 2005). The Pepsico court rejected an insurance carrier's contention that covered property was "not 'physically damaged' under the all-risk first-party property insurance policy" because the physical structure of the property was not physically altered. 24 A.D.3d at 744. Specifically, the court explained that "'physical damages' [were] not defined in the policy[.]" Id. The court expressly rejected the insurer's argument, explaining: "we disagree . . . that to prove 'physical damages' the plaintiffs [insureds] must prove that 'there has been a distinct demonstrable alteration of the physical structure of the [covered property.]" Id. (original alterations omitted).

Similarly, the Schlamm Stone court examined a loss resulting from the aftermath of the September 11 terrorist attacks and evinced the same legal principle. See 800 6 Misc. 3d 1037(A) at *1-2. The plaintiff-insured filed an insurance claim based on "dust and other particles which remained in the air [and] made it difficult to remain in the offices for a long period of time." Id. at *1. The defendant-carrier raised the same argument as Defendants here, *to wit* "that plaintiff [] failed to allege any damage to its property." Id. at *4.

Thus, "the central question before the court [. . . was] whether 'property damage' as used in the Policy includes noxious particles in an insured premises." Id. The court held:

> Under the Policy, particles that have settled in the carpets and on other surfaces in plaintiff's offices *constitutes property damage*. The carpets and other surfaces are property of plaintiff, and the presence of noxious particles thereon *clearly impairs plaintiff's ability to make use of them*.

Id. (emphasis added). The court went on to further explain that "the presence of noxious particles, both in the air and on surfaces in plaintiff's premises, would constitute property damage under the terms of the policy." Id.

Like the "noxious particles" in Schlamm Stone, which "clearly impair[ed] plaintiff's ability to make use" of its property, id., the presence of the Virus—which caused over 200,000 deaths in the United States—impairs and eliminates an insured's ability to make use of its property entirely.

Pepsico and Schlamm Stone are hardly outlier decisions; the Second Circuit adopted their reasoning. See Parks Real Estate, 472 F.3d at 38. In Parks Real Estate, the Second Circuit applied New York law in considering whether an all-risk policy provided coverage for "a cloud of noxious particulate matter" where the policy covered "direct physical loss or damage except as indicated in the Exclusions[.]" 472 F.3d at 37. The particulate matter contained "known toxins or carcinogens" that could cause a "long-term risk to occupants." Id. at 38. The Second Circuit held that "contact of the airborne particulate matter with the Property" is a covered cause of loss under

the language of the "all-risk" policy. Id.

Accordingly, the Second Circuit expressly ruled the mere presence of airborne particles satisfied the threshold question as to whether there was "direct physical loss or damage except as indicated in the Exclusions[.]" See id. at 38, 48-49. The Second Circuit's analysis is directly applicable here. "Under an all-risk policy, 'losses caused by *any* fortuitous peril not specifically excluded under the policy will be covered.'" Id. at 41 (emphasis in original). The presence of the Virus at, in, throughout, and on Plaintiffs' property satisfies the "any fortuitous peril" standard. The Virus, by its very nature, constitutes a "noxious particle," and is thereby covered.

Cases across the country have ruled in the same manner as Pepsico, Schlamm Stone, and Parks Real Estate (including additional cases applying New York law). These courts rejected the argument that insurance policies with the operative "direct physical loss of or damage to" language do not provide coverage for losses arising from substances and materials that do not "physically alter property"—including the presence of illness- and disease-causing agents such as the e-coli bacteria, ammonia, asbestos fibers, and carbon monoxide. The following decisions (the "*Analogous Cases*") evidence the rejection of the argument that "direct physical loss of or damage to" property requires physical alteration to the property:

- Essex Ins. Co. v. BloomSouth Flooring Corp., 562 F.3d 399 (1st Cir. 2009). The First Circuit held that "odor can constitute physical injury to property" and "allegations that an unwanted odor permeated the building and resulted in a loss of use of the building are reasonably susceptible to an interpretation that physical injury to property has been claimed." Id. at 406.

- Port Authority of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226 (3d Cir. 2002). Applying New York and New Jersey law, the Third Circuit held that if "asbestos in the air of a building is such as to make the structure uninhabitable and unusable, then there has been a distinct loss to its owner," and there has been a "physical loss or damage." Id. at 236. "The effect of asbestos fibers in such quantity is comparable to that of fire, water or smoke on a structure's use and function." Id.

- Motorists Mutual Ins. Co. v. Hardinger, 131 F. App'x 823 (3rd Cir. 2005). The Third Circuit held the presence of "e-coli bacteria" can constitute "direct physical loss." Id. at 825. The court found "a genuine issue of fact whether the functionality of the [insured's] property was nearly eliminated or destroyed, or whether their property was made useless or uninhabitable." Id. at 826-27.

- TRAVCO Ins. Co. v. Ward, 715 F. Supp. 2d 699 (E.D. Va. 2010), aff'd, 504 F. App'x 251 (4th Cir. 2013). The court held that "toxic gases released by" drywall is "direct physical loss" under the policy. Id. at 708-09. "If [the insurer] intended to define covered losses more narrowly, it should have done so more clearly. Having failed to do so, [the insurer] cannot now rewrite a policy it issued in hopes of avoiding the terms of an instrument it drafted." Id. at 709-10.

- Gregory Packaging, Inc. v. Travelers Property Cas. Co., 2014 WL 6675934 (D.N.J. 2014). "Ammonia release" in the insured's building was held to be "direct physical loss of or damage to Covered Property" Id. at *1. "[T]he ammonia release physically transformed the air within [the covered property] so that it contained an unsafe amount of ammonia or that the heightened ammonia levels rendered the facility unfit for occupancy until the ammonia could be dissipated." Id. at *6. "[T]he ammonia discharge inflicted 'direct physical loss of or damage to' [the Covered Property] . . . because the ammonia physically rendered the facility unusable for a period of time." Id.

- Cooper v. Travelers Indem. Co. of Illinois, 2002 WL 32775680 (N.D. Cal. 2002), aff'd, 113 F. App'x 198, 202 (9th Cir. 2004). A policy that "provides for coverage of 'direct physical loss of or damage to Covered Property at the premises" covered "presence of E-coli" at the Covered Property. Id. at *1-2.

- Columbiaknit, Inc. v. Affiliated FM Ins. Co., 1999 WL 619100 (D. Or. 1999). The court held that property with "pervasive, persistent or noxious odor" and "increased microbial counts and that will, as a result, develop either an odor or mold or mildew" may constitute "direct physical loss of or damage to" property. Id. at*4-5, 7. The court noted "physical damage can occur at the molecular level and can be undetectable in a cursory inspection." Id. at *6.

- Mellin v. Northern Security Insurance Company, Inc., 167 N.H. 544 (N.H. 2015). "[P]hysical loss may include not only tangible changes to the insured property, but also changes that are perceived by the sense of smell and that exist in the absence of structural damage," and that "a change rendered the insured property temporarily or permanently unusable or uninhabitable may support a finding that the loss was a physical loss to the insured property." Id. at 550.

- Matzner v. Seaco Ins. Co., 9 Mass. L. Rptr. 41 (Mass. 1998). "[C]arbon-monoxide contamination constitutes 'direct physical loss of or damage to' property." Id. at *3-4. "[T]he phrase 'direct physical loss or damage' is ambiguous in that it is susceptible of at least two different interpretations. One includes only tangible damage to the structure of insured property. The second includes a wider array of losses. Following the rule of construction that an

ambiguous phrase be accorded the interpretation more favorable to the insured, I adopt the latter interpretation." Id. (emphasis in original).

- <u>Sentinel Management Co. v. New Hampshire Ins. Co.</u>, 563 N.W.2d 296 (Minn. 1997). An all-risk policy covering "direct physical loss to building(s)" covered the "release of asbestos fibers" that caused the presence of "asbestos fibers on carpeting and other surfaces" of the covered building. <u>Id.</u> at 298. "*<u>Direct physical loss also may exist in the absence of structural damage to the insured property</u>*." <u>Id.</u> at 300 (emphasis added). "Although asbestos contamination does not result in tangible injury to the physical structure of a building, a building's function may be seriously impaired or destroyed and the property rendered useless by the presence of contaminants." <u>Id.</u> Therefore, "contamination by asbestos may constitute a direct, physical loss to property under an all-risk insurance policy." <u>Id.</u> at 301; <u>see also</u> <u>Gen. Mills, Inc. v. Gold Medal Ins. Co.</u>, 622 N.W.2d 147, 152 (Minn. Ct. App. 2001) ("direct physical loss can exist without actual destruction of property or structural damage to property; it is sufficient to show that insured property is injured in some way").

- <u>Farmers Ins. Co. of Oregon v. Trutanich</u>, 123 Or. App. 6 (Or. 1993). The court held that a pervasive odor form methamphetamine lab that had infiltrated the covered property constituted "direct physical loss." <u>Id.</u>

- <u>Western Fire Ins. Co. v. First Presbyterian Church</u>, 165 Colo. 34 (Colo. 1968). "Direct physical loss" included "gasoline and vapors thereof" that "infiltrated and contaminated the foundation and halls and rooms of the" covered premises "making further use of the building highly dangerous." <u>Id.</u> at 36, 38-39. "[T]here was a direct physical loss occasioned to the church building" that "brings the insured within the 'all risk' coverage provided." <u>Id.</u> at 40.

In sum, at the time that the subject policies were issued in 2019 and/or 2020, numerous cases nationwide, spanning more than fifty (50) years: (i) rejected Defendants' argument that coverage for "direct physical loss of or damage to" property requires physical alteration to the property, and (ii) held that various substances, including disease- and illness-causing agents, are covered under policies containing the very language Defendants claim brings the instant loss outside the scope of coverage.

Against the weight of the *Analogous Cases* rejecting the argument that the Physical Loss Language requires physical alteration, Defendants point to one decision that purportedly supports their interpretation: <u>Universal Image Productions, Inc. v. Chubb Corp.</u>, 703 F. Supp. 2d 705, 709

(E.D. Mich. 2010). <u>Universal Image</u> does *not* support that "direct physical loss of or damage to" property requires physical alteration as a matter of law. <u>Id.</u>

The <u>Universal Image</u> court considered whether a policy covering "direct physical loss or damage to building or personal property" covered "pervasive odor, mold and bacterial contamination." <u>Id.</u> at 709. After full fact-finding, the court granted the insured's motion for summary judgment, holding:

> [The insured] has not shown that it suffered any structural or any other tangible damage to the insured property. Rather, the bulk of [the insured's] argument relies upon proof that it suffered such intangible harms as strong odors and the presence of mold and/or bacteria in the air and ventilation system within its Building which, *in its judgment*, rendered the insured premises useless . . . . Although [The insured] cites testimony which indicates that the entire first floor of its insured premises had been engulfed by an appalling odor, *<u>there is no evidence</u> that this stench was so pervasive <u>as to render the premises uninhabitable</u>.* The Court also notes that [the insured's] own expert . . . did not even suggest that the entire premises be vacated . . . . This fact-standing alone-distinguishes the current case from <u>Trutanich</u> and <u>Matzner</u>, <u>supra</u>. <u>See also</u>, <u>Western Fire Ins. Co. v. First Presbyterian</u>, <u>supra</u>.

<u>Id.</u> Thus, only after full discovery and fact finding, including expert discovery, did the court rule that there was "no evidence" of "direct physical loss or damage" because, *inter alia*, there was no evidentiary support for the conclusion that the premises was uninhabitable. <u>Id.</u>

In addition, and importantly, the out-of-context quote from <u>Universal Image</u> often cited by insurers— "no physical loss occurs unless a contaminant actually alters the structural integrity of the property"—was *not the court's finding or holding*. 703 F Supp 2d at 705. Rather, the court was merely summarizing the insurer's position. <u>See</u> <u>id.</u>

On appeal, the Sixth Circuit affirmed because, *inter alia*, "[b]ased upon our detailed review of the record, . . . [the insured] has failed to present a genuine issue of material fact regarding the uninhabitability or usability of the [covered] building." <u>Universal Image Productions, Inc. v. Fed. Ins. Co.</u>, 475 F. App'x 569, 574 (6th Cir. 2012). According to the court, "no expert recommended

that [the insured] evacuate the building" and "there is no evidence in the record indicating that [the insured] was unable to remain in the [covered] building." Id. Finally, the court held that the insured "cannot recover for alleged uninhabitability relating to air-quality issues. Indeed, the insurance policy excludes 'air' from the definition of both 'building' and 'personal property.'" Id. at 574.

Universal Image does not support dismissal of this lawsuit because (1) the court did not hold "direct physical loss or damage to" property can only occur with structural alteration, (2) the court relied on full fact-finding and expert opinion (or lack thereof) to render a decision, whereas Defendants bring the instant Motion to Dismiss pre-answer and pre-discovery, and (3) unlike the instant policy, the Universal Image policy had an applicable exclusion that precluded coverage.

Furthermore, Defendants can only be granted judgment as a matter of law based on policy interpretation where the policy is not "subject to different reasonable interpretations[.]" Broome Cnty. v. The Travelers Indem. Co., 125 A.D.3d 1241, 1242 (3d Dept. 2015). Defendants cannot credibly argue that the Policy is not subject to differing reasonable interpretations where numerous learned courts across the country have read the exact provision at issue in Plaintiffs' favor for over fifty (50) years. At a minimum, an ambiguity exists precluding Defendants' Motion to Dismiss.

Pursuant to the above-cited *Analogous Cases*, interpreting the subject policy language, the Court should reject Defendants' claim that presence of COVID-19 is not, and cannot cause, physical loss or damage to the covered property, as a matter of law.

      3.    <u>The case law cited by Defendants is inapplicable, distinguishable, and does not support that physical alteration of property is required by the Physical Loss Language.</u>

Inexplicably, Defendants ignore <u>Studio 417</u> and the *Analogous Cases*. Instead, Defendants erroneously cite three cases to support its claim that that the Physical Loss Language requires physical alteration: <u>Roundabout Theatre Co., Inc. v. Continental Cas. Co.</u>, 302 A.D.2d 1 (1st Dept.

2002); <u>SatisPie, LLC v. Travelers Property Casualty Company</u>, --- F.Supp.3d ----, 2020 WL 1445874 (W.D.N.Y., March 25, 2020); and <u>Newman Myers Kreines Gross Harris, P.C. v. Great Northern Ins.</u>, 17 F. Supp. 3d 323 (S.D.N.Y. 2014) (collectively "*Divergent Cases*"). Defendant also cites five cases that specifically deal with COVID-19 insurance claims, even though they are distinguishable from the instant case and <u>Studio 417</u>: *[1]* <u>Social Life Magazine, Inc. v. Sentinel Ins. Co., Ltd.</u>, (S.D.N.Y. Case No. 20-cv-3311); *[2]* <u>Diesel Barbershop, LLC v. State Farm Lloyds</u>, (W.D. Tex. Case No. 5:20-CV-461) (Doc. 11-5); *[3]* <u>Rose's 1, LLC v. Erie Ins. Exch.</u>, (D.C. Super. Ct. Case No. 2020 CA 002424 B) (Doc. 11-7); *[4]* <u>10E, LLC v. Travelers Indem. Co. of Conn.</u>, (C.D. Cal. Case No. 2:20-cv-04418) (Doc. 11-8); and *[5]* <u>Gavrilldes Mgmt. Co. v. Michigan Ins. Co.</u>, (Mich. Cir. Ct. File No. 20-258-CB) (Doc. 11-6) (collectively Defendants' "*COVID Cases*").

The *Divergent Cases*—<u>Roundabout</u>, <u>SatisPie</u>, and <u>Newman Myers</u>—are inapplicable and do not support dismissal. Not a single one of the cases determine whether harmful substances at the covered property can constitute direct physical damage or loss, and each one was decided at the summary judgment stage after fact finding concerning the loss.

Unlike the deluge of *Analogous Cases*, which specifically establish that the presence of harmful substances at the covered premises are covered causes of loss irrespective of observable physical alteration, the *Divergent Cases* concern whether the insureds' purported loss of use of covered property arising from extraneous damage and events can constitute physical loss or damage to the covered property. See <u>Roundabout</u>, 302 A.D.2d at 6 (finding no coverage for lost use based on "off-site property damage"); <u>Newman Myers</u>, 17 F. Supp. 3d at 330 (finding that the "forced closure of the premises [was] for reasons exogenous to the premises themselves."); <u>SatisPie</u>, 2020 WL 1445874, at *5 (finding no coverage because insured acknowledged the covered property was "not damaged" and "the loss was caused by its disposal of product that was

*not contaminated*." (emphasis added)).

These decisions do not consider whether harmful substances—such as the Virus or other diseases- or illness-causing agents, such as e-coli, ammonia, asbestos, or mold—*present at the covered property* can constitute "direct physical loss of or damage to" the covered property.

In fact, in Newman Myers the court specifically analyzed certain of the *Analogous Cases* on which Plaintiffs rely: TRAVCO (noxious gas); Essex (unpleasant odor), and Motorist/Hardinger (contamination of well water). See 17 F. Supp. 3d at 330. The Newman Meyers court did *not* find these *Analogous Cases* legally incorrect. Id. Rather, the court found the *Analogous Cases* factually distinguishable because in the *Analogous Cases* the presence of harmful substances rendered the property "unusable or unsatisfactory for its intended purpose" and caused "direct physical loss or damage" to the Property, despite the lack of "structural damage." Id. The Newman Meyers court further explained:

> In each there was some compromise to the physical integrity of the workplace. *To be sure, the cases involving odors, noxious fumes, and water contamination did not involve tangible, structural damage to the architecture of the premises. But the critical policy term at issue, requiring "physical loss or damage," does not require that the physical loss or damage be tangible, structural or even visible. The invasions of noxious or toxic gases in TRAVCO and Essex, rendering the premises unusable or uninhabitable, were held to suffice, because even invisible fumes can represent a form of physical damage.* The contamination of well water in *Hardinger,* similarly involved physical damage, just not structural—there, to the building's water supply.

Id. (emphasis added). This reasoning supports Plaintiffs' claims here.

The court found that rather than being akin to TRAVCO, Essex, and Hardinger, the Newman Myers case was like Roundabout because it concerned the "forced closure of the premises for reasons exogenous to the premises themselves." Id. at 330. Thus, Defendants' cited legal authority is inapplicable to support dismissal.

The *COVID Cases* cited by Defendants are equally distinguishable and inapplicable; each one presents an inapplicable situation of either: (a) the insured failing to allege the presence of the Virus at their property; and/or (b) the inclusion of a virus exclusion in the policy.[4]

For example, Diesel Barbershop is inapplicable because (a) the court was not bound by governing New York law; and (b) the policy included a virus exclusion. (Doc. 11-5). While the court found the "cases requiring tangible injury to property [] more persuasive[,]" id., it was not bound by the applicable New York decisions (Pepsico and Schlamm Stone) or the Second Circuit decision in Parks Real Estate, which govern the instant matter.

Additionally, Diesel Barbershop—as well as Gavrilldes—involved a policy that included the "virus and bacteria exclusion," which the court held applied. Diesel Barbershop, (Doc. 11-5) at 15-18; Gavrilldes, (Doc. 11-6) at 20. In other words, the insurers in Diesel Barbershop and Gavrilldes specifically did what Defendants here chose not to do: exclude virus-related losses from "physical loss of or damage to the property."

Moreover, the insureds in Gavrilldes, Rose's 1, and 10E did "not allege any physical loss of or damage to the property." Gavrilldes, (Doc. 11-6) at 19; Rose's 1, (Doc. 11-7) at 5; 10E, (Doc. 11-8) at 8. Here, Plaintiffs clearly alleged the presence of COIVD-19 at their premises. (Doc. 9 [*Am. Complaint*], ¶¶ 63-66).

Naturally, if the insureds in Gavrilldes, Rose's 1, and 10E never had COVID-19 at the premises, they cannot be considered factually analogous cases. There would have been no "direct

---

[4]   Defendants' reliance on Social Life is misplaced. The insured sought a preliminary injunction for the immediate payment of its loss. In an oral decision from the bench, the court denied the insured's "motion for preliminary injunction." (Doc. 11-4). Thereafter, no decision or order was entered because, for unknown reasons, the lawsuit was dismissed and all pending motions were terminated pursuant to plaintiff's notice of dismissal, which was signed and "So Ordered" by the Court.

physical loss of or damage to" the property, as has been alleged here. Therefore, none of the case

law cited by Defendants is applicable and the Motion to Dismiss should be denied in its entirety.

<u>POINT III</u>

PLAINTIFFS STATE A VIABLE CLAIM FOR
CIVIL AUTHORITY INSURANCE COVERAGE

Under the Policy's Civil Authority coverage, "[w]hen a peril insured against causes

damage to property other than property at the premises," Defendants cover the loss of income

"caused by action of civil authority that prohibits access to the premises" if (i) "[a]ccess to the area

immediately surrounding the damaged property is prohibited by civil authority as a result of the

damage," (ii) Plaintiffs' premises is "not more than one mile from the damaged property," and (iii)

"action of civil authority is taken in response to dangerous physical conditions resulting from the

damage **or** continuation of the peril insured against that caused the damage." (Doc. 9-1 [*Hutch*

*Policy*], p. 13; Doc. 9-2 [*Remington Policy*], p. 19 (emphasis added)).

COVID-19 was present at, in, throughout, and on Plaintiffs' premises, property within one

mile of Plaintiffs' premises, and throughout New York State. (Doc. 9 [*Am. Complaint*], ¶¶ 63-66).

The presence of COVID-19 and the resulting damage to Plaintiffs' premises, property in the

immediate area of Plaintiffs' premises, and property throughout New York, caused civil authorities

throughout New York to issue orders suspending business operations and prohibiting access to

commercial property. <u>Id.</u> at ¶¶ 63-78.

Governor Cuomo issued executive orders declaring "a State disaster emergency for the

entire State of New York," requiring the suspension of business and/or use of commercial property,

and prohibiting access to commercial property. Pursuant to the NYS Shutdown Orders arising from

the COVID-19 "disaster emergency," all non-essential businesses were required to reduce on-site

workers by: (a) fifty percent (50%), effective March 20, 2020; (b) seventy-five percent (75%),

effective March 21, 2020; and (c) one-hundred percent (100%), effective March 22, 2020 (all of the New York State Executive Orders arising from COVID-19, including the NYS Shutdown Orders, are collectively referred to as the "CA Orders"). (Berloth Decl. Exs. 12, 13, & 14).

 In addition, pursuant to Executive Order 202.3, effective March 16, 2020, restaurants, including Plaintiffs' premises in this case, were prohibited from "serving patrons food or beverage on-premises." (Berloth Decl. Ex. 11). On June 6, 2020, pursuant to Executive Order 202.38, "Executive Order 202.3, as extended, that required any restaurant or bar to cease serving patrons food or beverage on-premises" was "modified to the extent necessary to allow a restaurant or bar to serve patrons food or beverage on-premises only in outdoor space." (Berloth Decl. Ex. 15).

Plaintiffs state a claim for Civil Authority coverage because the "action of civil authority"—*to wit* the CA Orders—(1) "prohibit[ed] access to the premises"; (2) was a result of "property damage" within one mile of Plaintiffs' premises; (3) was necessitated by damage caused by a "peril insured against" (COVID-19); and (4) was "in response to dangerous physical conditions resulting from the damage." (Doc. 9-1 [*Hutch Policy*], p. 13; Doc. 9-2 [*Remington Policy*], p. 19). Moreover, the action of civil authority remained in effect and prohibited access due to a "continuation of the [COVID-19] peril insured against that caused the damage." Id.

Defendants assert that Plaintiffs' claim for Civil Authority coverage must be dismissed, as a matter of law, because (a) Plaintiffs failed to allege "damage to property other than property on the insured's premises," (b) the CA Orders "did not prohibit all access" to the premises, and (c) the CA Orders were not issued in response to property damage. Defendants' claims are meritless.

A.      **Plaintiffs satisfactorily allege damage to property other than property on the insured's premises.**

Defendants' claim that Plaintiffs failed to allege damage to other property blatantly ignores Plaintiffs' allegations. Plaintiffs specifically allege damage to property in "the immediate area of

Plaintiffs' Premises" and "within one mile of Plaintiffs' property." (Doc. 9 [*Am. Complaint*], ¶¶ 64-72, 110). Plaintiffs also allege that because COVID-19 is "ubiquitous," "it existed and/or exists throughout the State, including, without limitation, Plaintiffs' Premises and property in the immediate area of Plaintiffs' Premises," and "caused direct physical loss of or damage" to such property. Id., at 65-72; see also DeVito, 227 A.3d at 889-90 (rejecting claim that petitioner's business was not in the "COVID-19" "disaster area" declared due to COVID-19's "presence in and movement through Pennsylvania" because "any location (including Petitioners' businesses) where two or more people can congregate is within the disaster area.").

**B.** **The Policy does not require "all" access be restricted for civil authority losses to be covered.**

Defendants also assert that, to trigger Civil Authority coverage, the action of civil authority must "prohibit *all* access." (Doc. 11-3 [*Def. Mem. L.*], p. 21) (emphasis added). In other words, although the policy covers "action of civil authority that prohibits access to the premises," Defendants attempt to re-write the policy to require a prohibition on "*all* access to the premises." Applying its conjured "all access" interpretation, Defendants claim that Civil Authority coverage does not apply because certain people, such as "business owners, vendors, or delivery personnel," could still access the Covered Property without violating the CA Orders. Id.

Defendants' attempt to reconstruct the policy language to add "all" access runs afoul of governing principles of contract interpretation. It is well settled that "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." Reiss v. Fin. Performance Corp., 97 N.Y.2d 195, 199 (N.Y. 2001); Beardslee v. Inflection Energy, LLC, 25 N.Y.3d 150, 157 (N.Y. 2015) (same); Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P., 13 N.Y.3d 398, 404 (N.Y. 2009) (same). Therefore, Defendants' attempt to add the word "all" to limit coverage

under the guise of interpretation must be rejected. If a civil authority's prohibition on all access was necessary to trigger coverage, Defendants should have said so in the Policy they drafted.

It cannot be disputed that the CA Orders "prohibit[ed] access to the premises." The CA Orders prohibited "in-person workforce at any locations" by fifty percent (50%), seventy-five percent (75%), and then one-hundred percent (100%). (Berloth Decl. Exs. 12, 13, & 14). In other words, all of businesses' employees were ultimately prohibited from going into the buildings. Moreover, with regard to restaurants such as Plaintiffs, customers and members of the public were prohibited from dining inside the restaurant, or even stepping foot inside the building.

Simply put, Plaintiffs' business was interrupted because the CA Orders clearly "prohibit access to the premises." The term "prohibit" means "to forbid (an action, activity, etc.) by authority or law," "to forbid the action of (a person)," "to prevent; hinder." DICTIONARY.COM, https://www.dictionary.com/browse/prohibit?s=t (last visited Sep. 30, 2020). The term "access" means "the ability, right, or permission to approach, enter, speak with, or use; admittance." DICTIONARY.COM, https://www.dictionary.com/browse/access?s=t (last visited Sep. 30, 2020). Based on the plain meaning of "prohibit" and "access," a government order that forbids people from entering a premises clearly "prohibits access to the premises." Here, because the CA Orders prohibited employees and the public from entering the subject restaurants, the CA Orders prohibited access to such restaurants.

The only case that Defendants cite for their "all access" position—54th St. Ltd. Partners, L.P. v. Fid. and Guar. Ins. Co., 306 A.D.2d 67 (1st Dept. 2003)—does not support dismissal. In that case, after fact finding, the court granted the insurer's motion for summary judgment under the civil authority provision because "although vehicular and pedestrian traffic in the area was diverted, access to the restaurant was not denied; *the restaurant was accessible to the public,*

*plaintiff's employees and its vendors*." Id. at 67 (emphasis added).

Defendants' analogy between traffic merely being diverted and a global, life-threatening pandemic is illogical. In 54ᵗʰ St., although the civil authority order diverted traffic, the public, employees, and others could still access the property without violating the order. Conversely, the CA Orders here prohibited Plaintiffs' customers and workers from going into the premises regardless of route or means of transportation.

Rather than citing distinguishable and inapplicable decisions, Plaintiffs cite to the recently held Studio 417 decision that actually examines the COVID-19 pandemic as it effects analogous businesses. See 2020 WL 4692385. In Studio 417, the plaintiff-insureds alleged: (a) with respect to the plaintiffs' hair salons, "a Closure Order 'required hair salons and all other businesses that provide personal services to suspend operations[]'"; and (b) with respect to the plaintiffs' restaurants, "*the Closure Orders mandated 'that all inside seating is prohibited in restaurants,'* and that 'every person in the State of Missouri shall avoid eating or drinking at restaurants,' with limited exceptions for 'drive-thru, pickup, or delivery options.'" Id. at *7 (emphasis added). Based on these allegations, the court held that "*[a]t the motion to dismiss stage*, these allegations plausibly allege that access was prohibited to such a degree as to trigger the civil authority coverage." Id. (emphasis added). The court further explained:

> [t]his is particularly true insofar as the Policies require that the "civil authority prohibits access," *but does not specify "all access" or "any access" to the premises. For these reasons, Plaintiffs have adequately stated a claim for civil authority coverage.*

Id. (emphasis added).

At a minimum, "prohibits access" is ambiguous in this context. For example, in Datatab, Inc. v. St. Paul Fire & Marine Ins. Co., 347 F.Supp. 36 (S.D.N.Y 1972), a business interruption policy covering data processing equipment included coverage in the event the "premises in which

- 36 -

the property is located is so damaged as to prevent access to such property." Id. at 37. A watermain break occurred in the basement of the building containing the data processing equipment. The event caused "no physical damage" to the data processing equipment and "physical access to [the insured's] equipment was unimpeded"; however, it "forced a shutdown of the computers and data processing equipment." Id. At issue was whether the insured was covered because it was "prevent[ed] access" to the data processing equipment. In this context, the Court found the term "access" ambiguous and, as such, interpreted the policy in favor of the insured as follows:

> In construing the words narrowly, [the insurer] argues that, since there was no direct physical damage to plaintiff's premises on the fifth and sixth floors, and since physical access to the equipment was unimpaired after the breakdown, the triggering contingencies did not occur.
>
> [The insured] naturally argues a broader interpretation of the words, contending that "premises" refers to the entire building, not just the fifth and sixth floors; and that the word "access" does not refer to the ability of a person physically to enter the [premises], but rather contemplates the ability to utilize the [covered property] normally in the operation of its business.
>
> Clearly, there is an ambiguity as to what the parties intended by the use of the words "premises" and "access." Under New York law, which the parties accept as controlling, it is the rule that ambiguities in the terms of an insurance policy must be resolved against the insurance company and in favor of the insured . . . . Thus, if the insured can offer a possible construction of the provision even though not the only construction-it must be accepted since the ambiguity will be construed against the insurance company . . . . *We find that [the insured] has not only offered a possible construction, but that it has offered an interpretation more reasonable than defendant's*.
>
> . . . . [The insurer's] interpretation of the word "access" is [] strained. Obviously, what was relevant and important to [the insured] when it bought the [insurance] policy was the ability to utilize the [covered property] in its business on a normal basis. [The insured] could not have been less interested in whether, following a peril insured against, it had the ability to physically touch a non-functioning mass of metal.

Id. at 37-38 (emphasis added).

Similar to the flawed analysis set forth by the insurer in <u>Datatab</u>, Defendants' position that the CA Orders did not "prohibit access" because some individuals, such as owners and delivery personal, could physically access parts of the Covered Property is inconsistent with underlying purpose of business interruption. The CA Orders prevented Plaintiffs from using the Covered Property "normally in the operation of its business." <u>Id.</u> Indeed, the CA Orders prohibited employees and customers from entering the premises and dining therein.

**C.** **<u>Defendants' contention that the CA Orders were not issued in response to property damage is conclusory and unsupported.</u>**

Defendants erroneously assert that Civil Authority coverage does not apply because the CA Orders were not issued in response to damage to property, but rather were issued to prevent future person-to-person spread of COVID-19. (Doc. 11-3 [*Def. Mem. L.*], p. 22). There is no support for Defendants' claim—other than their own conclusory allegations—that the CA Orders were issued solely for prophylactic purposes and not as a result of the Property damage caused by COVID-19. In fact, the examples of CA Orders, support Plaintiffs' claim. For instance, the NYC Executive Orders, which were issued in relation to and to carry out the NYS Shutdown Orders, specifically declared, *inter alia*, that "the virus physically is causing property loss and damage." (Dkt. No. 9-6). Thus, Defendants cannot credibly claim at the motion to dismiss stage that the CA Orders were not issued in response to property damage. At a minimum, an issue of fact exists.

Furthermore, the presence of COVID-19 in, on, and throughout Plaintiffs' premises, as discussed above, causes and constitutes property damage precisely because contact with such property may result in severe illness or death, and spread that severe illness to other people. In other words, a building and its contents contaminated with COVID-19 is damaged because contact with that property is harmful. There is no logical distinction between radiation, e-coli, ammonia, and mold contamination—which the insurance industry acknowledges to be property damage—

and COVID-19 contamination. In all cases, the property is damaged due to the presence and contamination of harmful substances and illness-causing agents.

Based on the forgoing, the CA Orders were the direct result of property damage, i.e., because entry into the buildings and contact with their contents could be harmful. Those orders continued for months due to "continuation of the peril insured against that caused the damage," i.e., COVID-19. (Doc. 9-1 [*Hutch Policy*], p. 13; Doc. 9-2 [*Remington Policy*], p. 19).

Therefore, Plaintiffs are entitled to coverage for the loss of business income during the period that the CA Orders prohibited access to the premises. At a minimum, Plaintiffs are entitled to discovery and an opportunity to prove their allegations that COVID-19 contaminated Plaintiffs' premises and property within one mile of thereof, resulting in CA Orders that prohibited access to Plaintiffs' premises. Those issues of material fact preclude judgment as a matter of law at this pre-discovery stage.

<u>POINT IV</u>

PLAINTIFFS STATE A VIABLE CLAIM UNDER NEW YORK GBL § 349

To make out a claim under New York General Business Law ("GBL") § 349, Plaintiffs are only required to allege (a) Defendants engaged in consumer-oriented activities, (b) those activities were materially false or deceptive, and (c) such activities caused actual injury to Plaintiffs. See <u>City of N.Y. v. Smokes-Spirits.Com, Inc.</u>, 12 N.Y.3d 616, 622-23 (N.Y. 2009).

**A.** **<u>Defendants' engaged in consumer-oriented activities in deciding to universally deny COVID-related claims regardless of the insureds' specific factual circumstances.</u>**

To make out the consumer-oriented-activities element, Plaintiffs must allege facts tending to show that Defendants' activities have implications for other similarly situated consumers in the public. <u>Smokes-Spirits.Com</u>, 12 N.Y.3d at 622-23. New York courts have identified three non-dispositive factors in determining whether a practice is consumer oriented: "1) the amount of

money involved in the agreement; 2) the relative bargaining power and sophistication of the parties; and 3) the nature of the agreement." Warren v. Mariner Fin., LLC, 16-CV-221, 2020 WL 4676658, at *5 (W.D.N.Y. Aug. 12, 2020). However, prior to addressing these three factors, Plaintiffs must dispel Defendants' erroneous implication that that insurance coverage disputes can never involve consumer-oriented activities. (See Doc. 11-3 [*Def. Mem. L.*], pp. 23-25).

1. The instant case presents an insurance dispute involving consumer-oriented activities.

GBL § 349 is properly applied to insurance disputes akin to the instant case. See Riordan v. Nationwide Mutual Fire Ins. Co., 977 F.2d 47, 51-52 (2d Cir. 1992); cf. New York Univ. v. Cont. Ins. Co., 87 N.Y.2d 308, 321 (N.Y. 1995). Defendants' cite three cases for the erroneous implication that insurance coverage disputes can never involve consumer-oriented activities. See H&H Envtl. Sys., Inc. v. Evanston Ins. Co., No. 6:18-CV-06315 EAW, 2019 WL 1129434 (W.D.N.Y. Mar. 12, 2019); Kraatz v. USAA Cas. Ins. Co., No. 16-CV-00103-FPG, 2017 WL 876187 (W.D.N.Y. Mar. 6, 2017); Bartlett v. Nationwide Mut. Fire Ins. Co., 2013 U.S. Dist. LEXIS 22320 (W.D.N.Y. Feb. 19, 2013). The Second Circuit expressly held otherwise:

> This argument fails, however, because it ignores the plain language of GBL § 349(g), which states that "this section shall apply to all deceptive acts or practices declared to be unlawful, whether or not subject to any other law of this state." By its own terms therefore, GBL § 349 applies to the acts or practices of every business operating in New York. . . . Nowhere does GBL § 349 provide an exception for insurance companies, nor does the Insurance Law exempt insurance companies from the reach of GBL § 349.

Riordan, 977 F.2d at 51-52.

Indeed, the New York Court of Appeals explained that a GBL § 349 claim will exist where a defendant's "acts or practices" have "a broad impact on consumers at large[.]" New York Univ., 87 N.Y.2d at 320. While many insurance disputes may constitute "essentially a 'private' contract dispute over policy coverage and the processing of a claim which is unique to the[] parties," an

insurance matter may still present consumer-oriented conduct "which affects the consuming public at large." Id. at 321. Thus, "relief under [GBL § 349] is not necessarily foreclosed by the fact that the transaction involved an insurance policy." Id.

Nonetheless, Defendants claim none of the acts Plaintiffs allege are consumer-oriented activities, because this lawsuit involves insurance coverage disputes that purportedly are unique to individual insureds and their insurers. Defendants are wrong.

Defendants' ask this Court to view this case in a complete vacuum and review only isolated allegations from Plaintiffs' Complaint.[5] The Complaint must be read as a whole and construed liberally, with all facts alleged accepted as true, and all reasonable inferences drawn in Plaintiffs' favor. La Liberte v. Reid, 966 F.3d 79, 85 (2d Cir. 2020).

For example, Defendants' argue that Plaintiffs' GBL § 349 claim "is premised almost exclusively on Erie's 'DFS Response' – the letter Erie Insurance prepared and issued in response to the March 10, 2020 directive of the New York Department of Financial Services[.]" (Doc. 11-3 [Def. Mem. L.], p. 25). Defendants then claim that the allegations set forth in paragraphs 164 through 188 of the Complaint are conclusory, unsupported by facts, and otherwise set forth only a "garden variety" coverage dispute unique to the parties named on the policies of insurance at issue. See generally id. at p. 25-29.

Defendants' ignore the allegations in the Complaint that are inconvenient to their position. (Compare Doc. 11-3 [Def. Mem. L.], pp. 25-29, with Doc. 9 [Am. Complaint], at ¶162 (incorporating and re-stating all prior allegations of the Amended Complaint into the GBL § 349

---

[5]      Defendants also attempt to claim Plaintiffs make allegations merely "upon information and belief", which is facially untrue for the overwhelming majority of Plaintiffs' allegations. (See Doc. 9 [Am. Complaint], ¶¶ 1-8, 37-78, 80, 83-113, 115-17, 112-25, 127-28, 130-33, 135-36, 138-39, 163-67, 169-76, 180-81, 183-88). Plaintiffs' allegations are supported, corroborated, and include reference to documentary exhibits attached to the Complaint. Id.

claim). Even a cursory reading of the Complaint demonstrates this lawsuit presents anything but a "garden variety" coverage dispute. This lawsuit arose because Defendants made a systemic decision to (i) treat all of their consumer-insureds the exact same way and (ii) deny each and every COVID-related claim, regardless of the individual facts or circumstances presented by any individual insured. (See Doc. 9 [*Am. Complaint*], ¶¶ 122-34, 172 (alleging that Defendants failed to investigate the particular facts and circumstances of Plaintiffs' claims, and issued standard, form denial letters that did not discuss any facts particular to Plaintiffs)).

To be clear, this case does not involve a situation where Defendants (i) received a claim of property damage, (ii) investigated that insured's specific claim, and (iii) rendered a denial letter to the insured, citing fact-specific bases for the denial. This case involves Defendants' universal denial of all COVID-related claims based on Defendants' unilateral determination that it would not afford such coverage under the all-risk policies it issued under any circumstances. Id. Illustrative of that point are Plaintiffs' allegations and exhibits demonstrating that Defendants issued virtually identical denial letters to different insureds, neither of which even attempted to identify any fact-specific, or individualized bases for the denials. Id.

Simply put, one would be hard-pressed to imagine a more consumer-oriented activity in an insurance context than that alleged by Plaintiffs. See, e.g., id. at ¶¶ 1-8 (alleging that Defendants have stated none of their all-risk policies purportedly do not insure against any loss stemming from the ongoing global pandemic); id. at ¶¶ 37-61 (alleging the existence of the Virus Exclusion implemented by the insurance industry as a whole, and most notably, a virus exclusion used by Defendants in other policies, but not in Plaintiffs' Policy); id. at ¶¶ 80, 83-107 (alleging that Defendants act uniformly, operate uniformly, and act for one another in virtually every respect); id. at ¶¶ 108-13, 115-17, 112-25, 127-28, 130-33, 135-36, 138-39, 163-67, 169-76, 180-81, 183-

88 (alleging the uniform nature of Defendants' universal pre-claim-determination to deny COVID-related claims from their insureds, regardless of whether those insureds' all-risk insurance policies contained a virus exclusion; producing and discussing the existence of documents substantiating those allegations and giving rise to a more-than-reasonable inference of Defendants' standardized practice and pre-determination of COVID-related claims handling; and alleging the bases for why those common issues and questions are amenable to class certification and resolution).

       2.     <u>Defendants conduct was consumer-oriented due to the nature of the agreement, their use of uniform, standard forms, and Plaintiffs' lack of bargaining power.</u>

Courts typically find that consumer-oriented activities involve: (a) disputes over "modest" sums of money (although "modest" is a subjective, moving target); (b) transactions where the parties have unequal bargaining power; and (c) standard forms issued by the defendant(s) to the consumer(s). <u>Warren</u>, 16-CV-221, 2020 WL 4676658 at *5.

To say that the bargaining power in the parties' relationships rests near-exclusively with the Defendants would be a drastic understatement. Indicative of that fact, is that the policies at issue were promulgated by Defendants, using standard forms that were drafted by Defendants and issued to Plaintiffs on a proverbial "take-it-or-leave it" basis. <u>See</u> <u>Pan Am.</u>, 505 F.2d at 1002-03 (explaining that an insured may "negotiate the scope of its coverage, paying a larger or smaller premium according to whether the scope of coverage was more or less extensive, but it had *no significant control of the terms defining coverage*." (emphasis added)); <u>Katz v. Am. Mayflower Life Ins. Co. of N.Y.</u>, 14 A.D.3d 195, 205 (1st Dept. 2004) ("the insured generally lacks the power to bargain for more favorable contract terms[.]"). While insureds may purchase different types of coverage, the forms used, terms therein, and types of coverage offered are dictated by Defendants.

Additionally, Defendants' coverage determinations, as well as the methods of distributing those determinations, are based on, and utilize, Defendants' standard forms and practices. (See Doc. 9-4 [*Hutch Denial*]; Doc. 9-5 [*Remington Denial*]). Defendants' standard-form denial letters sent to Plaintiffs do not reference any fact specific bases for the denials, or vary in any material way. Id. Instead, the denial letters evince a letter prepared for the masses that merely states there was no physical loss caused by the virus, so the claim is not covered—end analysis. See id.

The denial letters do not even include language required by the New York Department of Financial Services—further suggesting that the letters were prepared for use in masses, regardless of insured-specific circumstances such as State of residence or domicile. See, e.g., 11 NYCRR 216.6(h) (requiring disclaimer letters to prominently contain language informing the claimant of the right to dispute the insurer's coverage opinion with the DFS). Defendants made a blanket decision to deny COVID-related claims regardless even of differing, applicable State laws.

3.     Defendants' improper claims handling practices resulted in Plaintiffs and class-member-insureds not being given the opportunity to submit their loss damages.

In this case, the amount of money at stake for each named Plaintiff and putative class member will vary depending on the extent of their losses caused by COVID-19, and the amount of premiums those insureds paid for their all-risk, non-virus-excluding insurance policies. Consequently, the amount of money at issue could be as "modest" as a few thousand dollars, or it could be as large as several million dollars, depending on the class member. That fact alone is inconsequential compared to the other factors examining whether Defendants' conduct as a whole was consumer-oriented.

Notwithstanding, it is precisely because of Defendants' universal, consumer-oriented conduct—*to wit* its refusal to conduct any individualized, insured-specific investigation—that

precluded the insureds' opportunity to submit damage claims to Defendants. Thus, even this non-dispositive factor favors Plaintiffs.

Therefore, for all of the reasons discussed herein, the Defendants' activities in responding to the Covid-19 pandemic and their insureds Covid-19-related claims were consumer-oriented activities.

**B.      Defendants' engaged in materially false and deceptive activities resulting in actual injury to Plaintiffs.**

Plaintiffs' allegations and the exhibits attached to the Complaint demonstrate that Defendants not only knew about the availability of an express virus exclusion—they actually used it in other instances. Thus, issuing all-risk policies to Plaintiffs and putative class members that did *not* contain express virus exclusions, only to then make the universal decision to treat those insureds the same as policyholders *with a* virus exclusion, demonstrates that Defendants have materially misled and deceived its consumer base.

Defendants charged Plaintiffs and the class members premiums for insurance policies that did not contain a virus exclusion, charged other policyholders premiums for policies that did contain a virus exclusion, and yet treated them all the same in denying coverage. Accordingly, Plaintiffs and the class members suffered actual demonstrable damages from Defendants' misleading and deceptive practices, including, but not limited to: (i) paying higher premium rates for policies with no virus exclusion; (ii) incurring legal costs and fees to rectify Defendants' deceptive practices; (iii) not being paid insurance proceeds to which they are entitled; (iv) consequential damages resulting from Defendants' failure to pay those proceeds; and (v) for certain members of the class, being induced by the DFS letters to not make a claim to Defendants for their damages.

**CONCLUSION**

For all of the reasons set forth in the foregoing arguments, Plaintiffs respectfully

requests that this Court deny Defendants Motion to Dismiss in its entirety.

Dated: Buffalo, New York
      September 30, 2020

                DUKE HOLZMAN PHOTIADIS & GRESENS LLP

            By:    /s/ *Christopher M. Berloth*
                Charles C. Ritter, Jr.
                Steven W. Klutkowski
                Christopher M. Berloth
                *Attorneys for Plaintiffs*
                701 Seneca Street, Suite 750
                Buffalo, New York 14210
                critter@dhpglaw.com
                sklutkowski@dhpglaw.com
                cberloth@dhpglaw.com